UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GARY WHITED,

     Plaintiff/Counter-Defendant

v.

MOTORISTS MUTUAL INSURANCE CO.,

     Defendant/Counter-Plaintiff,

and                               CASE NUMBER: 08-10653
                                     HONORABLE VICTORIA A. ROBERTS
MOTORISTS MUTUAL INSURANCE CO.,

     Defendant/Third-Party Plaintiff,

v.

PATRICIA GREEN, CHRISTINE MARVASO,
and LUV-N-CARE, LLC, individually, jointly
and severally,

     Third-Party Defendants

_____/


## OPINION AND ORDER

## I.    INTRODUCTION

Gary Whited sued Defendant Motorists Mutual Insurance, Co. ("Motorists"), for

failure to pay benefits allegedly owed.  Motorists counterclaimed against Mr. Whited, his

sister, Patricia Green, Ms. Green's daughter, Christina Marvaso, and Luv-n-Care, LLC,

a Michigan corporation,[1] alleging overpayment, unjust enrichment, fraud and

misrepresentation.

_____

[1]In this opinion, the term "Plaintiff" does not refer to Mr. Whited personally, but to the
person(s) and/or entity(ies) representing his interests in this lawsuit.

Before the Court are Motorists' Amended Renewed Motion to Dismiss, Motion for Summary Judgment and Motion for Declaratory Relief against Mr. Whited, Ms. Green and Luv-n-Care (Dkt. # 95), and Motorists' Motion for Summary Judgment as to Christina Marvaso (Dkt. #93). Both motions are fully briefed. The Court heard arguments on August 20, 2010.

For reasons that follow, Motorists' motions are **GRANTED IN PART** and **DENIED IN PART**.

## II.      BACKGROUND

### A.      General

Around September 10, 1982, Gary Whited was involved in a car accident which left him a C5-6 incomplete quadriplegic. At the time, Plaintiff was insured under a policy issued by Motorists Mutual Insurance, Co., in accordance with Michigan's No-Fault Automobile Insurance Act ("the No-Fault Act"), Mich. Comp. Laws ("M.C.L.") § 500.3101, *et seq*.

In July 1983, Mr. Whited was released from the hospital into the care of his sister, Patricia Green. Ms. Green became Mr. Whited's attendant caregiver, and was compensated by Motorists for her services. For 20 years, she took care of her brother by herself, 24 hours per day, 365 days per year.

After 20 years, Mr. Whited's condition worsened, and Ms. Green could no longer take care of him by herself. In June 2003, Mr. Whited received a second, full-time, attendant caregiver, also paid for by Motorists.

In June 2007, Mr. Whited's condition deteriorated significantly; he became

dependent on a ventilator for breathing, and he required a feeding tube.  Ms. Green retained a home health agency, Health Partners, to provide attendant care, but she quickly became displeased with its services.

In August 2007, Ms. Green created a home health care agency named Luv-n-Care, LLC, solely dedicated to taking care of Mr. Whited.  Luv-n-Care was owned in equal parts by Ms. Green, Mr. Whited, and Ms. Green's daughter, Patricia Marvaso.  Ms. Green and Ms. Marvaso were the company's President and Secretary, respectively.  On October 11, 2007, Luv-n-Care took over all attendant care services for Mr. Whited.

Until 2008, Mr. Whited and Ms. Green spent part of the year at Ms. Green's house in Monroe County, Michigan, and the rest in Florida.  However, in December 2008, Mr. Whited was moved to Florida permanently.  Ms. Green went with him, but retained her house in Michigan.

In July 2009, Mr. Whited's condition took another turn for the worse.  Over the following months, he was hospitalized several times.  Some of these stays were only a few days long; others lasted months.  Mr. Whited died on April 9, 2010.

### B.    Procedural History

On November 20, 2007, Plaintiff sued Motorists in Wayne County Circuit Court to recover attendant-care payments allegedly owed under the No-Fault Act.  (Dkt. #1.)  Motorists removed to this Court in February 2008, and in June, counterclaimed for overpayment and unjust enrichment.  (Dkt. #7.)  Motorists amended its counterclaim on February 26, 2009, adding third-party claims against Ms. Green, Ms. Marvaso, and Luv-n-Care.  (Doc. #50.)  Motorists alleged unjust enrichment against Luv-n-Care, and unjust enrichment, fraud and misrepresentation against Mss. Green and Marvaso.

3

In June 2003, the start of the disputed period, Motorists paid Ms. Green $21.95 per hour as a High Tech Aide ("HTA"); the second caregiver was paid $12 per hour as a Home Health Aide ("HHA").[2]  Motorists paid for attendant care every other week, based on invoices submitted by Ms. Green.  Theoretically, the total cost should have been $12,222 every other week, or $293,328 over a year.  The actual amounts paid by Motorists tended to fluctuate above and below the $293,328 figure, but stayed within a range of 25,000.[3]

From June to October 2007, Health Partners assumed responsibility for Mr. Whited's care.   Health Partners hired Patricia Green and several other caregivers who were used to working with Mr. Whited.  Ms. Green and the other caregivers did the same work as before, but Motorists paid Health Partners significantly higher rates for its services.  For instance, Health Partners billed Motorists $26.75 per hour for Ms. Green's work as an HTA, and $25.75 for the other caregivers as HHAs.[4]

In October 2007, Luv-n-Care replaced Health Partners, and immediately began charging roughly double the rates Ms. Green billed Motorists before Health Partners was brought in.  When Motorists refused to pay the increased rates, Plaintiff sued for unpaid and underpaid attendant care benefits and invoices.  On advice from its

---

[2](Affidavit of Debbie Thompson, Def.'s Ex. A1 [hereinafter Thompson Aff.], at ¶ 5.) Motorists submits evidence that, in Monroe County, Michigan, in 2008, hourly rates for HTAs ranged from $10.95 to $13.27, HHA rates averaged $9.92 to $12.24, and Licensed Practical Nurses were paid $20.26 to $25.32.  (Affidavit of Sharon Filas, Def.'s Ex. A6 at ¶¶ 3-4.)

[3]From 2003-2006, Motorists paid the following amounts for Mr. Whited's attendant care: 2003: $269,642; 2004: $319,103.40; 2005: $273,222.42; 2006: $286,842.10.  (Def.'s Ex. D17(c).)

[4](*See* Pl.'s Ex. 18, Health Partners' invoices to Motorists.)

attorney, throughout this litigation Motorists continued to pay $12,222 on a bi-monthly basis, the same amount Motorists paid before Health Partners arrived.[5]  Luv-n-Care accepted the payments, but continued to send invoices to Motorists at the increased rates.[6]

Motorists claims it paid over $7,713,397.32 since Mr. Whited's accident for his care.[7]  Of this total, Ms. Green received $3,066,152.00; another $738,112 was paid to Luv-n-Care and individual caregivers.[8]  Presumably, the rest was spent on actual treatment for Mr. Whited.

Motorists claims that, from June 2003 to April 2010, based on representations by Patricia Green, Christina Marvaso and Luv-n-Care, it paid over one million dollars for attendant-care services that were either not provided, or unlawfully provided, to Mr. Whited.  In general, Motorists contends that Mr. Whited did not require constant care by two people (or 48 hours of attendant care per day), but that one full-time caregiver with additional assistance equivalent to four hours (or 28 hours per day) would have sufficed. Specifically, Motorists seeks to recover: (1) $19,459.48 for attendant care when Mr. Whited was hospitalized in intensive care; (2) $572,631.60 for services during the night; (3) $52,534.97 for services allegedly provided by Ms. Marvaso;[9] (4) $7,137.25 for

---

[5](Deposition of Maria Arezzo, Pl.'s Ex. 1 [hereinafter Arezzo Dep.], at 284-85.)

[6](Def.'s Exs. D7, D20-21.)

[7](Thompson Aff. ¶ 4.)

[8](*Id.*)

[9]Debbie Thompson's affidavit indicates that Motorists paid $52,544.98 for Ms. Marvaso's services between June 2003 and November 2008.  However, Ms. Thompson's calculation duplicates amounts allegedly paid to Ms. Marvaso in 2007 and 2008, and does

services allegedly provided by Elizabeth Rehahn; and (5) $381,754.40 for services that were not provided, or that were outside of the caregivers' scope of employment.[10]

## C. Discovery Proceedings; Allegations Relative to Motion to Dismiss

Discovery was an acrimonious process, with disputes at almost every step. The parties traded subpoenas, motions to quash, motions to compel and requests for protective orders. (Dkt. ##11-12, 17-18, 20-21, 25, 30, 37, 41-42). Between October 2008 and February 2009, the Court issued four orders for Plaintiff to produce discoverable materials. (Dkt. ##15, 24, 35, 49.) These orders covered a variety of documents pertaining to Luv-n-Care itself (incorporation papers, payroll and employee-benefits records, expense ledgers), and to its caregivers (personnel files including job descriptions, applications, resumes and certifications). The Court also ordered production of tax and bank records for Mr. Whited and Ms. Green, and Ms. Marvaso's bank records.

One of the most contentious issues was the production of Luv-n-Care's time and attendance sheets ("timesheets") and daily progress notes, sometimes referred to as patient progress notes ("DPNs"). Every two weeks, caregivers were given individual timesheets to keep track of their hours. For each shift, they wrote down the date, their arrival and departure times, and the number of hours worked. These forms were filled in by hand and signed by the individual caregiver. Timesheets were collected by Ms. Green and used to determine caregiver compensation.

---

not include $13,320 for 2006. (Def's Marvaso Reply Br. (Dkt. 106), at 10 n.5.) When these corrections are taken into account, the new total is $52,534.97.

[10](*See* Thompson Aff. at 9, damages spreadsheet.)

For each individual shift, caregivers were also required to fill out a DPN.[11] DPNs were also handwritten and signed by the individual caregiver. Their purpose was to summarize Mr. Whited's condition and keep a record of the care he received.[12] DPNs were kept in a three-ringed binder available to all caregivers, so the later shifts could review them and see what services or activities the earlier shifts performed.

Whether Mr. Whited required or received round-the-clock attention from two caregivers is in dispute. However, the parties agree that, if two caregivers were present at the same time, they each filled out a separate DPN. Motorists also states that it was "standard operating procedure" for caregivers to identify each other in their respective DPNs.[13] It is unclear if, by "standard operating procedure," Motorists means that this is a regulatory mandate, something certified nursing assistants ("CNAs") are trained to do, or if this practice was specific to Luv-n-Care. In any case, Plaintiff does not dispute that this was common practice among caregivers.[14]

Following substantial allegations that some documents were falsified, the Court

---

[11](*See* Affidavit of Brenda Biddle (Dec. 4, 2009), Def.'s Ex. A2 [hereinafter Biddle Aff. I], at ¶ 7 ("Ms. Green always instructed me and other caregivers to write detailed [daily progress] notes for the insurance company."); Affidavit of Mari Young, Def.'s Ex. A3 [hereinafter Young Aff.], at ¶ 5; Affidavit of Henriette Antoine, Def.'s Ex. A4 [hereinafter Antoine Aff.], at ¶ 11; Affidavit of Franklin Delano Peterson, III, Def.'s Ex. A11 [hereinafter F. Peterson Aff.], at ¶ 13; Affidavit of Ashley Dawn Boggs, Def.'s Ex. A12 [hereinafter Boggs Aff.], at ¶ 6; Affidavit of Irma Cook-Pollard, Def.'s Ex. 14 [hereinafter Cook Aff.], at ¶ 3.)

[12]For example, a typical DPN might state: "9 a.m.: clocked in, Gary was sleeping; 10 a.m.: gave Gary his bath in bed; 11 a.m.: transferred Gary to his wheelchair;" etc.

[13](Thompson Aff. ¶ 12.)

[14](*See* Deposition of Brenda Biddle, Def.'s Ex. B2 [hereinafter Biddle Dep. vol. II], at 217-18; Deposition of Jacob J. Peterson, Def.'s Marvaso Ex. 9 [hereinafter J. Peterson Dep.], at 88-89.)

warned Plaintiff that failure to comply with discovery orders would result in the action's dismissal. The Court also ordered that Plaintiff's computers undergo a forensic analysis to determine if they were used to manufacture or alter evidence. Since these events form the basis of Motorists' motion to dismiss, the Court describes them in detail.

In the fall of 2008, Motorists moved to compel disclosure of all timesheets compiled since the creation of Luv-n-Care. Motorists argued these records were necessary to verify that Luv-n-Care's invoices to Motorists reflected services actually provided to Mr. Whited. On October 24, 2008, the Court gave Plaintiff 21 days to disclose all time and attendance records. (Dkt. #24, at ¶ 3.) Plaintiff still failed to comply, and on December 11, 2008, on another motion from Motorists, the Court ordered all outstanding timesheets produced by January 7, 2009. (Dkt. #35, at ¶ 9.)

On April 28, 2009, citing Plaintiff's continuing failure to abide by discovery orders, Motorists moved to dismiss Plaintiff's complaint, pursuant to Fed. R. Civ. P. 37(b)(2)(A). (Dkt. #63.) Motorists said numerous documents and records remained outstanding, and argued that Plaintiff's delays prejudiced its ability to defend itself.

On May 13, 2009, the Court heard arguments on the motion; Cheryl Lord represented Motorists and Eileen Sullivan represented Plaintiff. Ms. Lord said that, on April 17, she received two bankers boxes with timesheets and other files that should have been produced on or before January 7.[15] Among these documents, Ms. Lord found timesheets that contradicted others she previously received: although they pertained to the same caregiver and the same pay period, the number of hours worked

---

[15](Transcript of Hearing on Motorists' First Motion to Dismiss, Def.'s Ex. E2 [hereinafter 1st Mot. Dismiss Hr'g Tr.], at 4.)

did not comport.[16]  In addition, the handwriting on some timesheets suggested they were filled out and signed by different people; others were simply marked "signature on file."[17]  Ms. Lord expressed concern that someone was manufacturing new timesheets to reflect hours billed to Motorists by Luv-n-Care.[18]

Ms. Lord also said that many original DPNs, which were filled out and signed by individual caregivers, were missing and replaced with computer checklists that were simply initialed.[19]  In particular, Ms. Lord said, Motorists did not receive any handwritten DPNs for Ms. Marvaso.[20]

The Court questioned Plaintiff's counsel about Motorists' allegations, but Ms. Sullivan could only say that she produced all the documents she received from her

---

[16](*Id.* at 6-7.)  For example, Motorists received two timesheets for Brenda Biddle for the period from March 16 to 31, 2008.  (Def.'s Ex. D6.)  The first one is signed by Ms. Biddle and indicates that, during those two weeks, she worked 155 hours and took four days off.  The second timesheet is in a different handwriting and marked "signature on file." It states that, during the same period, Ms. Biddle worked 191.5 hours without taking a single day off.  Similarly, Motorists received two timesheets for Christina Marvaso for November 1-15, 2008: one is unsigned, and indicates that she worked 66.25 hours; the other is signed and states 92.5 hours for the same period.  Not all duplicate cases are as egregious.  Some duplicates state the same number of hours, and in one case, the number of hours listed on the timesheet marked "signature on file" is lower than the one signed by the caregiver.  Often, however, both timesheets are signed by the caregiver, and involve smaller discrepancies in hours.  Still, this significantly complicates the discovery process for Motorists, because it requires additional work to determine which timesheet is the original.

[17](*Id.* at 6.)

[18](*Id.* at 4-5.)

[19](*Id.* at 15-16; Def.'s Ex. D16.)

[20](1st Mot. Dismiss Hr'g Tr. 16-18.)

client.[21]  When asked if she could explain why Motorists received duplicate and

contradictory timesheets, Ms. Sullivan answered:

> I can't, Your Honor.  All I can tell you is I have requested the documents
> from [Ms. Green].  These are the documents that she produced.  Whether
> there's some missing or not, I can't answer that.  I can tell you this[,] and
> this doesn't go to this motion, but I can tell you my office will be filing a
> Motion to Withdraw for a number of bases this week, and obviously the
> Court cannot entertain that today, but I thought the Court should at least
> be aware of that fact.

(1st Mot. Dismiss Hr'g Tr. 13-14.)  Of the specific reason for her withdrawal, Ms.

Sullivan said only: "Essentially it's a breakdown in the attorney/client relationship.  There

are other reasons that I would care not to say in open court." (*Id.* at 33.)

On May 19, 2009, the Court denied Motorists' motion to dismiss.  The Court held

that Plaintiff's conduct was not so egregious compared to other cases dismissed on

Rule 37(b) grounds, and noted that Plaintiff was not warned about the sanctions

associated with failure to comply with discovery orders.  (Dkt. #69, at 8.)  However, the

Court credited Motorists' representations about duplicate timesheets and DPNs

replaced with checklists, and expressed concern that Plaintiff may be altering or

destroying evidence.  (*Id.* at 10.)  The Court observed that Plaintiff's conduct during

discovery consistently lacked forthrightness, and came "perilously close" to willfulness

and bad faith.  (*Id.* at 10.)  To dispel any ambiguity about the precariousness of

Plaintiff's position, the Court added:

> Plaintiff is warned that further noncompliance with discovery or scheduling
> orders will result in dismissal with prejudice.  The Court will tolerate no
> further unjustified delays, particularly for items that have already been the
> subject of discovery orders . . . .

---

[21](*Id.* at 12.)

(*Id.* at 10.)

The Court ordered Plaintiff to fully comply with all outstanding discovery obligations, and set a deadline of June 1, 2009, for Plaintiff to produce "all Time and Attendance sheets and Daily Progress Notes from October 11, 2007 forward, *in their original form*, as well as all computer-generated Daily Progress Notes." (*Id.* at 12 (emphasis in original).) The Court specified that a presumption of adverse inference would apply to all documents submitted after this final deadline. (*Id.* at 12.)

The Court also ordered Plaintiff to ship "any and all computers used by Ms. Green or others to handle Luv-n-Care's affairs," to Speckin Forensic Laboratory ("Speckin") by May 26, 2009. To ensure against any tampering or fraud, the Court specified:

> No one, including Plaintiff, Ms. Green and Ms. Marvaso, may touch the computer(s), except for purposes of shipping . . . The Court expressly forbids anyone from turning on and using the computer(s), or taking any action to alter, delete, or otherwise render unusable any information pertaining to this case.

(*Id.* at 12-13.)

The Court granted Eileen Sullivan's motion to withdraw, but required her to serve a copy of the Order upon her clients by first-class and certified mail, and to file a Proof of Service. (*Id.* at 13.) Finally, the Court warned that if Plaintiff's action was dismissed for lack of compliance, Motorists' counterclaims against Mr. Whited, Luv-n-Care, Ms. Green and Ms. Marvaso would go forward. (*Id.*)

On June 2, 2009, the Court held a telephone status conference on the record. Since new counsel had not yet been retained, Plaintiff was represented by Ms. Green. Ms. Lord said she received four more bankers boxes of materials, but that many

timesheets and DPNs were still missing.[22] Ms. Green insisted she had given Motorists everything.[23]

Motorists also complained that Plaintiff did not send Luv-n-Care's computers on time to Speckin, the forensic laboratory. On May 26, 2009, the shipping deadline, Ms. Green called Ms. Lord from Florida and said she would bring two computers to her office the next day.[24] On May 29, 2009, Speckin received a box with two computers: a Gateway 4530GZ laptop ("the Gateway"), and a Hewlett Packard DV9000 laptop ("the DV9000").[25] The box was shipped by Tim Rehahn, a computer specialist who frequently did work for Luv-n-Care, prompting suspicion from Motorists.[26]

Ms. Green explained that when Mr. Whited was permanently transferred to Florida, in December 2008, she left the Gateway with Mr. Rehahn, who used it to do billing work for Luv-n-Care.[27] Ms. Green said she brought the DV9000 with her from Florida.[28] At this point, the following exchange took place:

> Ms. Lord: Could I ask for a clarification – originally [Ms. Green] told me she had two computers she was bringing . . . Which computer did she

---

[22](Transcript of June 2, 2009 telephone conference, Def.'s Mot. Ex. E4 [hereinafter June 2 Hr'g Tr.], at 10-12.)

[23](*Id.*)

[24](*Id.* at 13; Deposition of Patricia Green (Sept. 11, 2009), Def.'s Ex. B1 [hereinafter Green Dep. III], at 115-16.)

[25](Computer Forensic Exam, Def.'s Ex. C5 [hereinafter Speckin Report], at 3.)

[26](June 2 Hr'g Tr. 13-14.)

[27](*Id.* at 14-15; Deposition of Tim Rehahn, Def.'s Ex. B7 [hereinafter T. Rehahn Dep.], at 121; Green Dep. III, at 119.)

[28](June 2 Hr'g Tr. 16; Green Dep. III, 116-17.)

bring from Florida to Michigan, a laptop, or something else?

The Court: . . . When did Ms. Green tell you she was bringing two computers from Florida?

Ms. Lord: May 26th . . .

The Court: What happened to the two computers you were going to ship from Florida, Ms. Green?

Ms. Green: The one computer we use for business. The second computer is for my own personal use. There's nothing to do with Luv-n-Care. The third computer was in Michigan, the Gateway, which is also a laptop.

The Court: Well, I think that because of everything that has happened in this case, my Order was intended – it says ship any and all computers used by Ms. Green or others to handle Luv-n-Care affairs. . . I think in light of what has happened in this case you need to make arrangements to ship that to Speckin also. So when we get off line, you will talk to Ms. Lord about getting that computer to [Speckin].

(June 2 Hr'g Tr. 16-17.)

The Court does not know the parties' arrangement for shipping the third computer. In any case, on June 8, 2009, Speckin received a box shipped from Florida by Ms. Green, containing a Hewlett Packard Pavilion computer ("the Pavilion").[29]

On July 2, 2009, Motorists received 105 additional documents, including a number of typed DPNs signed by Ms. Marvaso.[30] However, Plaintiff did not produce any handwritten, signed timesheet for Ms. Marvaso, and many other timesheets are still outstanding, especially for Mss. Marvaso and Green.[31]

_____

[29](Speckin Report 2.) Brian O'Halloran, the husband of one of Mr. Whited's caregivers in Florida, testified that he shipped two laptop computers from Florida to a Michigan address at Ms. Green's request. It is not clear when or where the computers were shipped, or whether they were sent together. (Affidavit of Brian O'Halloran, Def.'s Ex. A13 [hereinafter B. O'Halloran Aff.], at ¶ 6.)

[30](Thompson Aff. ¶¶ 8-9.)

[31](*Id.* at ¶¶ 9-10, 20.)

Motorists compiled a detailed list of all documents produced by Plaintiff and the date at which they were received.[32]  The Court credits Motorists' accounting of discovery materials.

### 1.  Computer Forensic Examination

Speckin analyzed three computers: (1) the Gateway, used by Tim Rehahn in Michigan; (2) the DV9000, used by Ms. Green in Florida; and (3) the Pavilion, also used by Ms. Green.  The Gateway and the Pavilion were registered to PAG, for Patricia Ann Green.[33]

Before reviewing Speckin's findings, it is worth recalling that the Court had Eileen Sullivan serve Plaintiffs with a copy of the May 19 Order by certified mail.  Ms. Green received this copy at 10:37 a.m. on May 22, 2009, in Bradenton, Florida.[34]

### a.  The Gateway

The Gateway was the primary computer used to manage Luv-n-Care's affairs.  It contained all forms used by Luv-n-Care, including Timecards, DPNs, expenses and invoices.[35]  From December 2008 onward, Mr. Rehahn kept the Gateway at his home in Michigan, and used it to help Ms. Green manage Luv-n-Care.[36]

---

[32](Def.'s Ex. D17(g).)

[33](Speckin Report 5, 19.)

[34](Def.'s Ex. E5; Green Dep. III, 97.)

[35](T. Rehahn Dep. 120-22.)

[36](*Id.* at 121; Green Dep. III, at 119.)

According to Speckin, the Gateway was manufactured in 2004, and came with a hard drive that had a capacity of 60GB.[37]  However, this computer's original hard drive was removed and replaced with an older, smaller one.[38]  The replacement had a capacity of only 6.49GB, significantly limiting the computer's usefulness.  It contained no software or "man-made documents" used to run a business, like memos, spreadsheets or e-mails.[39]  In fact, the drive contained only the computer's operating system, which was installed on May 24, 2009.[40]  The machine was last used on May 25, 2009.[41]

When Motorists questioned Ms. Green and Mr. Rehahn about the Gateway's original hard drive, they provided contradictory answers.  Ms. Green said the Gateway crashed some time in April 2009, and that she instructed Mr. Rehahn to install a new drive and discard the original.[42]  Ms. Green could not explain why the machine was used as late as May 25, because she told Mr. Rehahn not to use it after receiving the May 19 Order.[43]

Mr. Rehahn said he replaced the hard drive on his own accord, without being instructed to do so by Ms. Green, because the Gateway would not start.[44]  He could not

---

[37](Speckin Report 3-4.)

[38](*Id.* at 3-4.)

[39](*Id.* at 7.)

[40](*Id.* at 5.)

[41](*Id.*)

[42](Green Dep. III, 124-25.)

[43](*Id.* at 125-26.)

[44](T. Rehahn Dep. 144-45, 151.)

remember when this happened, or when he replaced the drive, only that it was "not long before" the computer was shipped.[45]  Mr. Rehahn's wife testified that the machine was still functional and in regular use until "a very short time, maybe a few days or a week" before shipping.[46]  Before the problem occurred, Mr. Rehahn saved some files to a disc, but he was unable to recover anything after the drive failed.[47]  He described the saved files as: "the ones that the [Certified Nursing Assistants] use, the blank documents, the invoices, and that type of thing."[48]  Mr. Rehahn said Ms. Green told him the Gateway had to be shipped, but she did not specify a deadline, or mention that using the machine was prohibited by court order.[49]

### b.    The DV9000

The DV9000 was one of two computers Ms. Green used in Florida.  When she traveled to Michigan on May 27, 2009, she gave the computer to Mr. Rehahn.  Two days later, he shipped it to Speckin with the Gateway.[50]

Speckin found that over 1,300 files were deleted from this computer after the May 19 Order issued.[51]  Between May 19 and May 22, 391 files were destroyed.[52]  On

---

[45](*Id.* at 143, 147.)

[46](Deposition of Elizabeth Rehahn, Def.'s Ex. B8 [hereinafter E. Rehahn Dep.], at 64.)

[47](T. Rehahn Dep. 131-32, 151-52.)

[48](*Id.* at 123-24.)

[49](*Id.* at 139-41, 149, 151.)

[50](Green Dep. III, 117; T. Rehahn Dep. 139; Speckin Report 2.)

[51](Speckin Report 11.)

[52](*Id.* at 11.)

May 22, deletions began at 1:27 p.m., less than three hours after Ms. Green received the Order by certified mail; hundreds of additional files were deleted before the computer was last used on May 27, 2009.[53]

Plaintiff does not dispute that deletions occurred after May 19, but says the actual number of deleted files is closer to 900.[54]  More importantly, a forensic examiner retained by Plaintiff states that the deleted items were computer-generated files, such as cookies, temporary internet files and configuration files, and did not include user-data files like word-processing documents, spreadsheets, or e-mail.[55]  Based on this, the examiner concludes: "it does not appear that the person(s) who deleted the files intended to, or did, destroy user created data that would be crucial or relevant evidence."  (Id. at ¶ 11.)

The DV9000 computer also contained two spreadsheets, called "Timesheet issues" and "Issues for the 1st."[56]  The "Issues for the 1st" spreadsheet was created or last modified on January 1, 2009, a week before the Court's second production deadline.  This document consists of a list of missing or discrepant invoices, timesheets and schedules, with notes that suggest someone tried to reconcile differences between timesheets and schedules, including by recreating missing documents.[57]

---

[53](*Id.* at 11.)

[54](Affidavit of Ives Potrafka, Pl.'s Ex. 30, at ¶¶ 6-7.)

[55](*Id.* at ¶¶ 8-10.)

[56](Speckin Report 11, 24.)

[57]The following are examples of entries from the "Issues for the 1st" spreadsheet: Jan 16-31 2008: All – Patti, Karla, Jackie, Brenda, Henriette & Assyrian no timecards created them, need signed; Nov. 1-15 2008: Frank – Franks Schedule does not match his

### c.    The Pavilion

The Pavilion, which Ms. Green referred to as her personal computer, was last used on June 3, 2009, and arrived at Speckin on June 8.[58]  Dozens of files on this computer were either opened, created, modified or deleted between May 22 and June 2, 2009.[59]  Several documents were backdated, to look as though they were written months or years earlier.[60]

The Pavilion contained two e-mails from Mr. Rehahn to Ms. Green on the subject of timesheets.  The first one states: "Patti, Here are the timesheets, I zipped them because they were so large and so many.  Just unzip them, or extract them (double clicking it has that option usually) and you can open them.  Tim."  The e-mail contains an attachment titled "TimecardsFile1.ZIP," which was not recovered.[61]  The second message has several attachments which were also not retrieved, and states: "Patti, Here are the March timesheets.  Tim."[62]  These messages were sent on January 4 and 5, 2009, respectively.  These dates coincide with the Court's order to produce all outstanding timesheets by January 7, 2009.  (Dkt. #35, at ¶ 9.)

Mr. Rehahn testified that he created timesheets for caregivers who worked for

---

timecard, created a new timecard; March 15-31 2008: All – No timecards were found - will create them.  (Speckin Report 11-15.)

[58](Speckin Report 27, 2.)

[59](*Id.* at 25-26.)

[60](*Id.* at 19-20.)

[61](*Id.* at 21.)

[62](*Id.* at 30.)

Luv-n-Care.[63]  However, he did not know how many caregivers he did this for, or

whether he sent them to Ms. Green in a compressed (or "zip") file in January 2009.[64]

Speckin also found evidence that the Pavilion and the DV9000 were equipped

with software that makes them remotely accessible from another computer.[65]  This

program allows someone to use one computer to connect to another machine, transfer

data between them, and create, open, modify or delete files on the second computer.

Speckin's finding is corroborated by Brian O'Halloran, the husband of one of Mr.

Whited's caregivers in Florida.  Mr. O'Halloran testified that the Pavilion and the

DV9000 were linked to another computer in Michigan.[66]  However, it is unclear whether

that computer was the Gateway, or another machine entirely.

## 2.     Testimony of Former Caregivers and Associates

Motorists deposed several former Luv-n-Care employees or associates, a

number of whom agreed to provide sworn affidavits.  Rather than attempt to summarize

their contents, the Court reprints the affidavit of Leann O'Halloran, a CNA who worked

as an attendant caregiver for Luv-n-Care in Michigan and in Florida, from approximately

November 28, 2007 until Mr. Whited's death on April 9, 2010.  Footnotes indicate

statements corroborated by other caregivers.

Mrs. O'Halloran worked both the day and night shifts (9 a.m. to p.m.; 9 p.m. to 9

a.m.).  According to her, taking care of Mr. Whited was only one aspect of the work she

---

[63](T. Rehahn Dep. 154.)

[64](*Id.* at 154.)

[65](Speckin Report 16, 29.)

[66](B. O'Halloran Aff. ¶ 6.)

and her fellow caregivers were expected to perform.

> I always worked the night shift alone. There was never a second caregiver with me on the night shift whether I was in Michigan or Florida.[67] Ms. Green would be sleeping. Ms. Green insisted that we were NOT allowed to fall asleep on the night shift.[68]

> During the night shift, I cleaned, washed Patti's dishes and did her personal laundry.[69] I was also instructed to type the initials of the caregivers' on a Checklist. This form identified nursing services. I was told to put in the initials even though the services were not performed by any care-giver. It also had Patti Green's initials already on it as providing certain nursing skills on a daily basis, i.e., breathing treatment, even though they were not performed by her.[70]

> On the day shift, I was expected to clean, wash, mop the floors, clean

---

[67]Other caregivers confirm that there was only one person with Gary Whited during the 12-hour midnight shift. (*See* Biddle Aff. I ¶ 3; Young Aff. ¶ 6; Affidavit of Jennifer Holder, Def.'s Ex. A9 [hereinafter Holder Aff.], at ¶ 5; F. Peterson Aff. ¶¶ 4-5; Boggs Aff. ¶¶ 4-5, 14; Affidavit of Annette Kirby, Def.'s Ex. A15 [hereinafter Kirby Aff.], at ¶ 4; Affidavit of Jesusita Cruz, Def.'s Ex. A17 [hereinafter Cruz Aff.], at ¶ 4.); B. O'Halloran Aff. ¶ 7; Affidavit of Priscille Banton, Def.'s Ex. A18 [hereinafter Banton Aff.], at ¶ 6; Affidavit of Pamela Kaczor, Def.'s Ex. A19 [hereinafter Kaczor Aff.], at ¶ 4.) Some caregivers state they could awaken Ms. Green if they needed help with Mr. Whited (*see* Young Aff. ¶ 6; F. Peterson Aff. ¶ 5), but others say Ms. Green disliked being awakened. (*See* Holder Aff. ¶ 5 ("On the rare occasion I needed assistance, it was uncomfortable to awaken Ms. Green because she was so moody and unpredictable. I would seek out Frank Peterson and he would help me even though he would not get paid."); Cruz Aff. ¶ 9 ("There were a few occasions in the middle of the night when Gary got anxious and would ask for Patti. I would go and try to wake her up but she would not get up. Then I would try to wake her up in another half-hour and she would not get up. I would then have to try another twenty minutes later. If she got up, she would be extremely irritated. . . . She did not want to be disturbed."); Banton Aff. ¶ 6 ("I always worked [the night shift] alone. . . . Ms. Green would be sleeping. She told me that she did not want to be disturbed but told me never to put in the progress notes that she did not want to be disturbed. She said the insurance would think she was not doing her job.").)

[68](*See also* Biddle Aff. I, at ¶ 4; Boggs Aff. ¶ 13.)

[69](*See also* Biddle Aff. I, at ¶¶ 3, 10; Holder Aff. ¶ 5.)

[70](*See also* Holder Aff. ¶ 6; F. Peterson Aff. ¶ 6; Kirby Aff. ¶¶ 10-11; Banton Aff. ¶ 8.)

windows, cupboards, the refrigerator, blinds, etc.[71]  When Ms. Green had parties, all caregivers were expected to clean inside and outside, even more than the daily cleaning, both before and after the party.[72]  I was expected to cook, prepare food and bartend for 60 to 75 people.  Patti also expected me to prepare meals for her, her daughter's family and other guests.[73]  This was NOT for Gary.  Patti made it clear that the parties and guest needs took precedence over Gary's care-giving needs.[74]

Gary smoked around three or four packs of cigarettes[75] and drank 12 or more shots of tequila every day;[76] which the care-givers were required to give him.[77]  Gary switched to taking triple shots of Vodka around the fall of

---

[71](*See also* Young Aff. ¶ 12; Antoine Aff. ¶¶ 5-6; Affidavit of Anitha S. Simeon, Def.'s Ex. A5 [hereinafter Simeon Aff.], at ¶¶ 3-4; Holder Aff. ¶¶ 7-8; F. Peterson Aff. ¶¶ 4, 6, 15 ("I would do yard work, clean gutters, prepare for parties, polish the silverware and brass, blow off the driveway in both Michigan and Florida, power wash and re-organize the garage in Michigan, etc. and similar services that were billed for as performing HHA services."); Kirby Aff. ¶ 7; Affidavit of Kashema Williams, Def.'s Ex. A16 [hereinafter Williams Aff.], at ¶¶ 5-6; Cruz Aff. ¶ 6; Banton Aff. ¶ 7; Kaczor Aff. ¶ 10.)  According to Brenda Biddle, the caregivers' routine was very similar from 2003 to 2009: "During the morning shift there was generally two caregivers.  The second caregiver would clean until it was time to transfer Gary or assist with the wound program.  During the afternoon the second caregiver was often sent home early.  Both primarily did housework in the afternoon, especially when Gary was gone." (Biddle Aff. I, at ¶ 3.)

[72](*See also* Holder Aff. ¶ 7; F. Peterson Aff. ¶ 15; Kirby Aff. ¶ 13.)

[73](*See also* Holder Aff. ¶ 7.)

[74](*See also* Biddle Aff. I, at ¶ 10 ("It was our duty to wash the dishes, do housekeeping, prepare and clean up after [Ms. Green's] parties.  One night she asked me to leave Gary unattended so I could wash dishes and put a banquet full of food away."); Kirby Aff. ¶ 13.)

[75](*See also* Young Aff. ¶ 11; Antoine Aff. ¶ 10; Simeon Aff. ¶ 6; Holder Aff. ¶¶ 9, 11 ("He also smoked two-three packs of cigarettes per day.  Even for a smoker it was a lot."); F. Peterson Aff. ¶ 8; B. O'Halloran Aff. ¶ 9; Kirby Aff. ¶ 12; Kaczor Aff. ¶ 7.)

[76](*See also* Young Aff. ¶ 8; Antoine Aff. ¶ 10 ("When I first started working there, Gary asked me to get him a "shot."  I had no idea what he meant.  He told me it was in the freezer.  I then learned that it was "shots" of tequila.  I saw Gary drinking beer and taking shots of tequila all day long."); Simeon Aff. ¶ 6; Holder Aff. ¶¶ 9, 11; F. Peterson Aff. ¶ 8; B. O'Halloran Aff. ¶ 9; Kirby Aff. ¶ 8; Kaczor Aff. ¶¶ 7-8.)

[77](*See also* Simeon Aff. ¶ 6 ("Ms. Green told me that it was part of my job to light cigarettes for Gary."); Holder Aff. ¶¶ 9, 13 ("Ms. Green expected the care-givers to give

2009. Patti thought that this would not be detected in his urine samples and that you could not smell it on his breath.[78]

I was expected to lie about Gary's drinking and smoking and hide his addictions from his doctors, respiratory therapists and nurses.[79] We would have to remove all evidence of him smoking before any nurse or therapist came over, i.e. hide ashtrays, spray air freshener, etc.[80] I often went with Gary to his doctor's appointments. Prior to these appointments, we had to remove the yellow passey-muir that showed he was a smoker and replace with it the clean one.[81]

Even when Gary would come home from the hospital, he would continue to drink causing him to go back into renal failure and then back in the hospital. During the last few months of his life, Gary did not drink as much because he was so medicated but he continued to make gestures like he was still smoking.[82]

Patti treated the other care-givers and myself like we were beneath her.[83] Even though we did all of the cleaning she always acted like she was busy. She would run errands, visit and drink with friends. She provided very limited care-giving at home;[84] saying she performed even three or

---

Gary the liquor and his cigarettes as part of his daily activities. . . . After Gary had his lung surgery . . . we were still expected to give him alcohol and cigarettes. There was always a debate. Ms. Green would get mad if we did not give Gary the alcohol and cigarettes; and, she would also get mad sometimes if we did.").)

[78](*See also* Holder Aff. ¶ 9.)

[79](*See also id.* at ¶ 10; F. Peterson Aff. ¶ 9.)

[80](*See also* Holder Aff. ¶ 10; F. Peterson Aff. ¶ 9.)

[81](*See also* Holder Aff. ¶ 10.)

[82](*See also id.* at ¶ 11.)

[83](*See also* Antoine Aff. ¶ 5 ("Ms. Green treated me as a 'maid.'" . . . On one occasion, [she] told me to clean all of the glass and china in the curio cabinet and then put it back. She then told me to do it again because it was not clean enough."); Simeon Aff. ¶¶ 4, 7; F. Peterson Aff. ¶ 17; Boggs Aff. ¶ 15; Cruz Aff. ¶ 5; Banton Aff. ¶ 10 ("One night Gary said to me 'this black bitch needs to do the job.' Ms. Green responded 'can't you black people do anything right?' At that point, I picked up my purse and walked out the door."); Kaczor Aff. ¶ 20.)

[84](*See also* F. Peterson Aff. ¶ 7 ("When I started working for Ms. Green in June of 2006 . . . I observed that she would provide about six or seven hours of hands-on nursing

four hours a day would be extremely generous.[85]

When Gary was in the hospital, Patti would come every two to three days but would stay no longer than thirty or forty-five minutes.[86]  However, she would call every few hours and ask me to give her Gary's vitals that the hospital staff had taken.  Patti also wanted the names of the doctors who visited.[87] . . .  Patti wanted this information to put in her Patient Progress Notes to make it look like she was at the hospital.[88]

Doctors' orders meant nothing to Ms. Green.[89]  Ms. Green constantly and freely substituted and changed Gary's medications.[90]  She was also told not to give him any more diuretics because it would harm Gary's kidneys. Despite this, Ms. Green continued to give him diuretics such as Lasix, Chlorothiazide and Bumex all of the time.[91]  When I questioned her about this, she responded oh well, what do I have to lose.[92]  Ms. Green and Dr. Warren Abel from St. Anthony's Hospital clashed regarding Gary's medications.[93] . . .  Ms. Green changed them.  He found out and told her

---

care for Gary per day.  By June of 2007, she provided a couple of hours of hands-on care to Gary; which was about the same in June of 2008.  By June of 2009, I didn't see her much at all."); Kirby Aff. ¶ 8; Kaczor Aff. ¶ 14.)

[85](*See also* Biddle Aff. I, at ¶ 4 ("Ms. Green provided very limited care-giving services; saying she worked four (4) hours per day would be stretching it.").)

[86](*See also* F. Peterson Aff. ¶ 10 ("When Gary was in the hospital, I stayed with him on the night shift.  I was the only non-hospital staff person.  I never saw Patti [Green] there at night, except on the night of his lung surgery when she slept there."); Boggs Aff. ¶¶ 10, 11; Banton Aff. ¶ 4.)

[87](*See also* Boggs Aff. ¶ 12.)

[88](*See also id.* at ¶ 11.)

[89](*See also* Holder Aff. ¶ 16; Kaczor Aff. ¶¶ 11-12.)

[90](*See also* Holder Aff. ¶¶ 15-16; F. Peterson Aff. ¶ 11; Banton Aff. ¶ 4.)

[91](*See also* F. Peterson Aff. ¶ 11.)

[92](*See also* Holder Aff. ¶ 16 ("When I questioned her about Gary's care, she would get very mad at me.").)

[93](*See also* Holder Aff. ¶ 16 ("Ms. Green also had arguments with the respiratory therapists.  They would have her order new vents and ventilators because Ms. Green kept changing and experimenting with the ventilator settings.  The therapists would tell her not to do it; she would do it anyway.").)

she was not a doctor. . . .

Ms. Green also constantly changed Gary's wound care regimen.[94]  There was no plan regarding use of the wound care creams.  Jennifer Holder, LPN and I would just be getting Gary's ulcers on his buttocks and hip area to improve and then Ms. Green would repeatedly debride them.[95]  This hindered the ability of Gary's skin to re-grow.[96] . . .

Gary's ulcers were caused by his sitting in his wheelchair for hours on end at home, at his neighbors or at the bar.[97]  Patti would complain and get furious about Gary's bar bills.  His ulcers were not caused by an improper fitting wheelchair, the bed, or him laying flat in the hospital as I heard Ms. Green claim.[98]

. . .

When a second care-giver was on the day shift, Patti wanted that person to clean.[99]  For example, Abigail, was used almost exclusively to clean.  In fact, part of the interview process by Ms. Green was to demonstrate that you could pull or turn Gary by yourself.[100]  If you could do this, you would get the job.  Sometimes Patti would send the second care-giver on the day shift home early.[101]

(Affidavit of LeAnn O'Halloran, Def.'s Ex. A8 [hereinafter L. O'Halloran Aff.], at ¶¶ 3-15, 19.)

---

[94](*See also* Holder Aff. ¶ 16; Kaczor Aff. ¶ 13.)

[95](*See also* Holder Aff. ¶ 16.)

[96](*See also id.*)

[97](*See also* F. Peterson Aff. ¶ 12; Independent Medical Examination Record Review of Dr. Jennifer E. Doble, Def.'s Ex. C1 [hereinafter Doble Report], at 2 ("Based on review of the [medical] records, Mr. Whited's ulcers have developed from sitting up in the chair for prolonged periods of time, not performing pressure relief techniques (every 15 minutes is recommended)."; Independent Medical Examination Record Review of Dr. Myron M. LaBan, Def.'s Ex. C2 [hereinafter LaBan Report], at 1 (same).)

[98](*See also* F. Peterson Aff. ¶ 12.)

[99](*See also* Biddle Aff. I, at ¶ 6.)

[100](*See also* Banton Aff. ¶ 3 ("When I went to [interview, Ms. Green] tested me to see if I could pull and turn Gary.").)

[101](*See also* Biddle Aff. I, at ¶ 3; F. Peterson Aff. ¶ 13; Kaczor Aff. ¶ 5.)

As shown by the numerous references to other affidavits, most of Mrs. O'Halloran's statements find corroboration in the testimony of other former caregivers. However, in some cases, other caregivers discuss at greater length certain activities or events to which Mrs. O'Halloran only alludes. For instance, Mrs. O'Halloran states: "Gary's ulcers were caused by his sitting in his wheelchair for hours on end at home, at his neighbors or at the bar. Patti would complain and get furious about Gary's bar bills."[102] Other caregivers describe Mr. Whited's activities in greater detail.

Pamela Kaczor is a licensed registered nurse who worked for Health Partners, the company which briefly took over Mr. Whited's care, between June and October 2007.[103] Ms. Kaczor provided nursing services to Mr. Whited in the summer of 2007, at his home in Michigan. She testified that, during this time frame,

> I had several conversations with Ms. Green about Gary Whited leaving the house unattended. He left the house almost every day after he was dressed and in his wheelchair; generally between noon and 1:00 p.m. She would NOT allow me to go with him. He would be gone at least five to six hours at a time. He would take off to the local bar, Pinky's, go to the lake and to a friend's home in the neighborhood.

> I advised Ms. Green that I was responsible for his care and that Gary could go into autonomic dysplexia and potentially die. On one occasion, Gary went out by himself[,] returning within five minutes[,] diaphoretic. He was bluish. By the time we disconnected everything, his blood pressure had soared and there was mucus plugging his folly [sic] catheter. Urine was all over the kitchen. As soon as we got him back to normal and cleaned him up, he took off again, unattended. Ms. Green's response to my concern was that he needed his "alone" time.

> Gary would drink beer all day long and have shots of tequila. He was drunk to the point that he could not control his speech. . . . He also smoked cigarettes every day even while he was on oxygen. He also used marijuana. It was very unsafe when he was drunk or high.

---

[102](L. O'Halloran Aff. ¶ 15.)

[103](Kaczor Aff. ¶ 2-3.)

> Patti Green began calling me and asking me to come in later than my scheduled starting time at 7:00 p.m. because Gary was not home yet from his drinking excursions. He was always drunk when he arrived. Other times, she would tell me I could go home at 3:00 or 4:00 p.m. on my day shift because Gary was gone and would not be returning for hours. . . .

(Kaczor Aff. ¶¶ 5-8.) Other caregivers who worked during other time periods testified that Mr. Whited frequently went unaccompanied to friends' houses and to bars, from which he often returned either inebriated, high on marijuana, or both.[104]

In October 2007, Luv-n-Care replaced Health Partners as the entity responsible for Mr. Whited's attendant care. In January 2008, Ms. Green hired Karla Schrand to do administrative work for Luv-n-Care, including preparing invoices that were used to bill Motorists.[105] Ms. Schrand testified that, when she worked for Luv-n-Care,

> Ms. Green told me she could invoice the insurance company for 48 hours per day for care-giving services so she wanted to make sure that I invoiced for 48 hours per day even though 48 hours of care-giving services were not supported by the time sheets. A lot of the hours were made up. She told me to fill in the difference with hours under her name and under my name. I also invoiced for Ms. Green's daughter, Christina Marvaso. Ms. Green stated to me something to the effect that we could use her daughter Christina Marvaso to help make the total daily hours 48. I was told to make sure that each invoice billed 48 hours per day. By May of 2008, she told me to put down sixteen (16) hours per day for her (eight

---

[104](*See* Antoine Aff. ¶ 7 ("The only care giving [sic] I provided to Gary Whited was in the morning. Once Gary got up in his wheelchair he would take off in the neighborhood by himself. I never went with him. . . . My husband saw Gary in his motorized wheelchair on 49th Street by himself without any caregiver on several occasions."); F. Peterson Aff. ¶ 4 (stating that, during the day shift, he often took "Gary to his friend's house."), ¶ 13 ("Most of the time when Gary went to the beach, or friends, or Pinky's, O'Neco Rose, he had at best only one care-giver with him"); Holder Aff. ¶ 12 ("Gary would leave the house to go to the neighbor's where he would get drunk and high. When he returned home, he had the "mean lean"; he was falling out of his wheelchair. I was expected to keep an eye on him when he was at the neighbor's but this was impossible from inside Ms. Green's house and while doing the expected housecleaning. Gary also went to the bars, especially O'Neco Rose and the Banana Factory. . . .").)

[105](Affidavit of Karla Schrand, Def.'s Ex. A10 [hereinafter Schrand Aff.], at ¶ 2.)

for the day shift and eight for the night shift). At that same time, she told me to invoice 12 hours per day for Brenda Biddle regardless of what her time sheets provided. I have reviewed the invoices I prepared for Luv-n-Care from October 11, 2007 through July 15, 2008. There was not one single day where the records supported two care-givers at all times for the full 24 hours.

(Schrand Aff. ¶ 8.) Luv-n-Care billed Ms. Schrand's hours to Motorists; the invoices describe Ms. Schrand as an attendant caregver, despite the fact that she did not provide care to Mr. Whited.[106]

Karla Schrand stopped working for Luv-n-Care at the end of July 2008.[107] She was replaced for a few months by Christina Marvaso.[108] In November 2008, Ms. Green hired Elizabeth Rehahn to handle administrative matters for Luv-n-Care.[109] Luv-n-Care billed Ms. Marvaso and Ms. Rehahn's hours to Motorists as attendant-care services, despite the fact that they performed administrative and bookkeeping work.[110]

The great majority of caregivers testified that they were required to perform medical duties for which they were not licensed, or that they witnessed others required to do so.[111] Several testified that they feared they might lose their license because of

---

[106](*Id.* at ¶¶ 4-6.)

[107](*Id.* at ¶ 2.)

[108](Deposition of Patricia Green (Oct. 20, 2008), Def.'s Ex. B1 [hereinafter Green Dep. I.], at 109.)

[109](Deposition of Patricia Green (Jan. 15, 2009), Def.'s Ex. B1 [hereinafter Green Dep. II], at 378.)

[110](E. Rehahn. Dep. 87-91, 106.)

[111](*See* Biddle Aff. I, at ¶ 13; Young Aff. ¶ 4; Simeon Aff. ¶ 8; Holder Aff. ¶ 14; F. Peterson Aff. ¶ 18; Boggs Aff. ¶ 17; Kirby Aff. ¶ 10; Williams Aff. ¶¶ 7-8; Cruz Aff. ¶ 7; Banton Aff. ¶ 8; Kaczor Aff. ¶ 16.) Brian O'Halloran, who has no nursing experience or license, testified: "In approximately March of 2010, Ms. Green hired me to provide

this.[112]  There are also a number of claims that Ms. Green paid caregivers less than she

promised them, or refused to pay altogether.[113]

According to Mrs. O'Halloran (and the corroborating statements of her fellow

caregivers), from the early days of Luv-n-Care's existence, employees were required to

omit certain facts from their DPNs.  However, as time (and this lawsuit) progressed,

these omissions and modifications became more and more widespread and elaborate.

> When I first started, Patti would highlight what she wanted me to re-write
> on my patient progress notes.[114]  I had to omit any reference about Gary
> drinking, smoking, unattended, going to the bar, neighbors, etc.[115]

---

caregiving services for Gary Whited.  I had two hours of training and then started working
the night shift 9:00 p.m. to 9:00 a.m.) that night.  I always worked alone.  I performed cough
assists, suctioning, trache care and Nebulizer treatments."  (B. O'Halloran Aff. ¶¶ 2, 7.)

[112](*See* Biddle Aff. I, at ¶ 2; Kirby Aff. ¶ 10; Cruz Aff. ¶ 3; Kaczor Aff. ¶ 19.)

[113](*See* Biddle Aff. I, at ¶ 9 ("Ms. Green would have me work 24-hour shifts but then
pay me for only 16 hours.  She told me the insurance company wouldn't pay.  Initially, she
tried to pay me for only 12 hours until I complained.  She even asked me to work free for
one full year stating we would go on lots of cruises."); Antoine Aff. ¶ 9; Simeon Aff. ¶ 5
("When Ms. Green hired me, she told me I would get $17 per hour.  When I got my first
paycheck I was paid only $12 per hour.  When I confronted her about this she said maybe
in 2-3 months if you do a good job."); Boggs Aff. ¶ 18 (Ms. Green promised Ms. Boggs $15
per hour, but paid her $10.  When Ms. Boggs complained, Ms. Green said there was a 90-
day probationary period, but after three months, she continued to receive only $10);
Williams Aff. ¶ 4 (same); Cruz Aff. ¶ 10 (same); Banton Aff. ¶ 12 (same); Holder Aff. ¶ 8
("Ms. Green . . . purchased some Kentucky Fried Chicken for her guests.  It was left out in
[the] kitchen over night.  She made me pay her $30 back because the chicken sat out all
night."); F. Peterson Aff. ¶ 15 ("One time Ms. Green deducted my hours or charged me $15
per hour because I failed to blow off the driveway or take the trash out.").)

[114](*See also* Boggs Aff. ¶ 9 ("Ms. Green also instructed me on what I was not allowed
to include on the Patient Progress Notes.").)

[115](*See also* Antoine Aff. ¶ 11 ("Ms. Green would "correct" or change [my DPNs] to
her satisfaction."); Holder Aff. ¶ 13 ("I was not allowed to chart on the Patient Progress
Notes that Gary was drinking, drunk, smoked cigarettes, marijuana, went to the bars,
friends or that he took off by himself, or the housecleaning that I performed."); F. Peterson
Aff. ¶ 13 ("Ms. Green would require me to re-write my Patient Progress [notes] if I had any

After the holidays (Christmas 2008/New Years of 2009), Ms. Green was on a new mission regarding the re-writing of patient progress notes. I would get a stack of five to re-write. . . . The care-givers and myself also had to create new ones.[116] For example, I had to use Frank's notes to make patient progress notes for myself for shifts I did not work.[117] Patti wanted to make it look like two care-givers were working when she was not there. Later on, Patti wanted us to add certain words and phrases to the patient progress notes. I would have to rewrite notes if they only identified one care-giver coming on shift. For example, if I wrote "gave report to Ashley", Patti made would make [sic] me rewrite it to say gave report to Ashley "and Patti."[118] She also made us write that "Patti administered medications", even though the other care-givers and myself administered them.[119] She also told us we had to write that Gary was transferred from the bed to the wheelchair with "assist" even though I did

---

reference to Gary smoking, drinking, being unattended, etc."); Boggs Aff. ¶ 9; Banton Aff. ¶ 5; Kaczor Aff. ¶ 9 ("Ms. Green would NOT allow me to chart that Gary was drunk or that he took off by himself.").)

[116](*See also* Holder Aff. ¶ 28 ("I was told to create Patient Progress Notes for dates I did not provide services and for other care-givers that I never even met. I would have to look at time cards, patient progress notes from other care-givers and then create them. We were told to create these patient progress notes by Patti Green to make it look like services were performed even though they were not. Patti kept saying that if she did not have a job, we would not have a job. She kept making us go over and over this paperwork.").)

[117](*See also* Cook Aff. ¶ 5 ("I have reviewed a Patient Progress note [attached to my affidavit]. The [note] is NOT in my handwriting and is not signed by me. I never provided care-giving services in Florida.").)

[118](*See also* F. Peterson Aff. ¶ 14 ("By March or April of 2009, Patti repeatedly told me that I had to write in my daily Patient Progress Notes that she was with me and assisting me with Gary even though she was not. For example, I had to write 'Patti and I turned Gary,' 'Patti and I pulled Gary up,' 'Patti and I did wound care,' etc., and that I gave 'report to another caregiver 'and Patti[.'"'"]); Boggs Aff. ¶ 8 ("Ms. Green was emphatic that I write down her full name, not just Patti. She instructed me that I had to write that "Patricia Green" performed these services even though she did not. If I failed to do these things, she would make me re-write the patient progress notes."), ¶¶ 9, 11; Williams Aff. ¶ 8; Cruz Aff. ¶ 8.)

[119](*See also* F. Peterson Aff. ¶ 14; Boggs Aff. ¶ 7; Williams Aff. ¶ 8; Cruz Aff. ¶ 8.)

transfers by myself.[120]  No one asked Patti for assistance because she would get mad.

Patti also asked to me rewrite and sign time sheets in early 2009.  Some were in Patti's handwriting; and, some were in Tim Rehahn's handwriting.[121]  She would ask can you sign this? Then she would say this is the last one.  Then she would bring more to sign.[122]  She would also ask me to recopy time sheets in my own handwriting and re-sign after the fact.[123]  I have seen my time sheets and there are at least three time sheets in which my signature was forged.  Many of my time sheets also had hours and dates changed and were whited-out.[124]  I was concerned that I did not work all of the hours Patti had on the time sheets. When I

---

[120](*See also* Biddle Aff. I, at ¶ 6 ("I would have to do turns by myself. . . . [Ms. Green] told me I had to get stronger.  I told her I thought we needed two people to do this."); F. Peterson Aff. ¶ 14 ("I did not need assists for transfers . . . I performed all medical services by myself."); Boggs Aff. ¶¶ 8, 16 ("I was also required to write that transfers were done 'with assist' or other activities required 'assists' even when I was the only caregiver and no one else provided an 'assist.' . . . Ms. Green would get made at me because I could not lift Gary by myself for bathing him."); Kaczor Aff. ¶ 15 ("The whole time I worked there, it never took two (2) people to turn Gary Whited even though he is a big guy (around 200lbs. or more) because of the sand bed.  Patti used to brag that it does not take two people because of that bed.").)

[121](*See also* Kirby Aff. ¶ 9.)

[122](*See also* Biddle Aff. I, at ¶ 12 ("Ms. Green asked me to come in and sign completed time cards for previous hours of service.  I signed two.  She asked me to come back the following day and sign a stack of time cards for a ton of hours for previous time frames.  I asked her to prove that I worked those hours.  She got mad and said 'you don't know what kind of trouble I am in.'  Then she said I will just put 'signature on file.'"); Biddle Dep. II, at 144-45; Schrand Aff. ¶ 7 (identifying several time sheets carrying her name but not her handwriting, and marked "signature on file").)

[123](*See also* Holder Aff. ¶ 27 ("I was asked to rewrite and sign time sheets to match schedules two or three at a time.  Some of my time sheets also had hours and dates changed and were whited-out by Patti Green.").)

[124]Several other caregivers testified that timesheets bearing their names had been either modified in part, or written by someone else entirely and marked "signature on file." (*See* Biddle Dep. II, at 112-13, 123-24, 128, 262; Schrand Aff. ¶ 7; Holder Aff. ¶ 27; F. Peterson Aff. ¶ 16; Kirby Aff. ¶ 9 (identifying timesheets that appear to have been written by Ms. Green); Deposition of Jacqueline Bell (July 21, 2009), Def.'s Ex. B3, at 23-26, 30-31 (stating that, although she never worked nights or weekends, several of her timesheets had hours for those times).)

questioned the hours, Patti would say something like, "you can trust me; I never cheated anybody a day in my life, not one penny". . . .

(L. O'Halloran Aff. ¶¶ 16-18.)

In March 2009, Tim Rehahn traveled to Florida.[125]  According to Leann O'Halloran, this visit marked a concerted enterprise, led by Patricia Green and Mr. Rehahn, to create, alter and revise DPNs and timesheets in preparation for this lawsuit. Several caregivers were involved in this effort.  Mrs. O'Halloran recounts this episode in her affidavit:

> [A]round February and March of 2009, Jennifer Holder, Kathy Ervin (Patti's friend) and I assisted Patti Green and Tim Rehahn in organizing, creating, revising and selectively destroying patient progress notes for this lawsuit.  For example, while reviewing the patient progress [notes] if we could not fix information that was damaging, it would get crumpled up and Patti would say something like, "oh well, we lost another one."[126]  Jennifer, Kathy and I stamped literally thousands of Patient Progress Notes (hand-written and typed) with a stamp of Patti's signature (Patricia Ann Green). We also wrote her initials "PG" next to all nursing activities on all of the hand-written care-givers patient progress notes.  Patti made us practice writing her initials.  Patti said this paperwork was more important than Gary's care-giving because she was going to prison.[127]

(L. O'Halloran Aff. ¶ 20.)

---

[125](*See* Speckin Report 23 (recovered e-mail from Tim Rehahn dated March 23, 2009, informs Ms. Green that he is in Georgia and will arrive the following day).)

[126]For instance, Brenda Biddle testified: "On February 4 and 5, 2008, Gary attended a birthday party at the Beach House for a friend.  Gary got excited and took off in his wheelchair.  There was a step down in this outdoor restaurant and he and his wheelchair fell over.  He was taken to Blake Memorial Hospital. . . . I wrote a very detailed Progress Note about this incident.  Ms. Green always instructed me and other caregivers to write detailed notes for the insurance company."  (Biddle Aff. I, at ¶ 7.)  Motorists states that none of the numerous DPNs provided by Plaintiff corresponds to Ms. Biddle's account.  The Court credits Motorists' representation.

[127](*See also* Holder Aff. ¶ 24.)

Jennifer Holder was an attendant caregiver from December 2008 to May 2009, and again from July to November 2009.[128]  Her affidavit corroborates Mrs. O'Halloran's account of Mr. Rehahn's visit to Florida and the manufacturing activities which took place during that time.[129]  She provides several additional details:

> LeAnn, Kathy Ervin and I, all at the same time, had to use the stamp of Patti's signature (Patricia Ann Green) and write her initials of "PG" next to all nursing activities on all of the care-givers handwritten patient progress notes.  Patti made us practice writing her initials.
>
> . . .
>
> We would have to create three piles for all of the documents: one for Ms. Green's attorney; one for Maria Arezzo [who issued checks on Motorists' behalf] and one for the insurance company attorney, Ms. Lord. . . .
>
> Tim Rehahn also made a chart regarding the time cards of the care-givers and the list of things that needed to be made up.  I saw this chart while he was in Florida.  It had the names of various caregivers, dates of missing time cards and other discrepancies, i.e. hours did not match from schedule and what time cards had to be made or changed.  Ms. Green shredded a lot of documents; she was so afraid the insurance company would get them.[130]  Tim, Patti and I created and changes [sic] time sheets for the various care-givers to be consistent with Tim's chart.

(Holder Aff. ¶¶ 22, 25-26.)

Mrs. O'Halloran recounts that, in May 2009, Ms. Green said something like "now they want my computers," and asked if Mrs. O'Halloran's husband knew how to erase e-mails from a computer.[131]  Brian O'Halloran states:

---

[128](*Id.* at ¶ 3.)

[129](*Id.* at ¶¶ 18-28.)

[130](*See also* F. Peterson Aff. ¶ 20 ("I was told by other care-givers that Patti [Green] was having them create Patient Progress notes and time sheets for this case and shredding documents.  I was required to take the trash to a strip mall by Patti's house in Florida because Patti was paranoid that the insurance company was going through her garbage and doing surveillance.").)

[131](L. O'Halloran Aff. ¶ 22.)

I became aware that there was a court order compelling Ms. Green to ship her two HP laptops to Michigan. Ms. Green asked me how to erase the emails on both her personal computer and the computer used by the care-givers for their notes. At Ms. Green's request, I spent several hours in Ms. Green's home office erasing hundreds of emails on her personal computer. There were no emails on the care-giver's computer, however, Ms. Green wanted me to check for emails; and, if I found any I was instructed to erase them. Ms. Green also asked me how to erase the hard drive on a computer. I told her you could not erase a hard drive because it would leave an imprint; however, I told her that the hard drive could be replaced. Ms. Green also asked me to ship the two HP laptops to Michigan.

(B. O'Halloran Aff. ¶ 6; *see also* L. O'Halloran Aff. ¶ 22.)

Some time later, Mrs. O'Halloran overheard Ms. Green call Tim Rehahn and tell him to replace a computer hard drive.[132] Ms. Green said that Mr. Rehahn was going to make the Gateway computer crash on purpose, and bragged to Mrs. O'Halloran and Jennifer Holder about replacing the hard drive.[133]

### 3. Discovery Pertaining to Christina Marvaso

Christina Marvaso is Patricia Green's daughter, Mr. Whited's niece. Between 2003 and 2008, Motorists paid $52,534.97 for attendant care services she allegedly provided.[134]

On March 26, 2009, Ms. Marvaso and her attorney, Paul Robinson, met with Motorists' counsel, Cheryl Lord, and her paralegal, Debbie Thompson. According to Ms. Thompson, at this meeting,

Marvaso said she performed caregiver services to Gary. She claimed that

---

[132](*Id.* at ¶ 23.)

[133](*Id.* at ¶ 23, 25; Holder Aff. ¶ 29.)

[134](Affidavit of Debbie Thompson, Def.'s Marvaso Ex. 1 [hereinafter Thompson Marvaso Aff.], at ¶ 11.)

she personally filled in dates and times she worked at the end of each work day on her TA's [time and attendance sheets]. At the end of each shift, she would sign the time card and turn it in to her mother every other week. She said she did not see her mother sign it. Additionally, Christina said she knew that the other caregivers would hand write detailed DPN's because she saw them carrying around forms on clipboards. She said she used a computerized form (a sample which was shown to her) and would "check" and initial after each she [sic] had competed [sic] an item/task. She said the last time she provided services was November 2008.

(Thompson Marvaso Aff. ¶ 8.)

Plaintiff produced several timesheets for hours allegedly worked by Ms. Marvaso. These timesheets carried her signature, but the arrival and departure times and hourly totals were handwritten by Ms. Green.[135] Plaintiff also produced many DPNs in checklist form, but none pertained to Ms. Marvaso.[136]

When Motorists deposed Ms. Marvaso, on May 11, 2009, she testified that she only signed her timesheets, but had difficulty explaining why her mother filled them out.

Q: Is it your testimony under oath that you never filled out an attendance time sheet for Luv-n-Care; you never filled one out?

A: No, I did not actually fill it out.
    . . .

Q: So . . . are you saying that your mother would write in say, for example, June 1 that you came in at 8 a.m. and she would write out on 12 p.m. and then write in the hours?

A: Yes.

Q: And you never ever filled out your own hours on time sheets for the services you provided?

A: No.

Q: Why is that?

_____

[135](Def.'s Marvaso Ex. 4.)

[136](Thompson Marvaso Aff. ¶¶ 6-7.)

A: I don't know.

Q: Don't you think that's strange?

A: She's always did it for me.

Q: So if you had a midnight shift and she was asleep, you would have her wake up in the middle of the night to sign a time sheet for you?

A: No. She would just always have it written in.

Q: How would she know if she wasn't there or if she was sleeping?

A: She always was there.

Q: Your testimony under oath is that your mom was also there 24 hours a day, seven day a week?

A: The majority of the time she was there.

Q: The question is what would happen if she wasn't there? How would she know what to put down for your time frame?

A: I guess I would have to put it down.

Q: Put it down on what?

A: On this time sheet, on the time sheet; but she always did it for me. I didn't question that. I just went with it.

(Deposition of Christina Marvaso, Def's Marvaso Ex. 3 [hereinafter Marvaso Dep.], at 130-31.)

Ms. Marvaso also testified that she did not use DPNs in checklist format, but that she filled out the same DPN forms as the other caregivers, by hand, on the day of her shift.[137] However, unlike other caregivers, whose DPNs were placed in a binder available to all, Ms. Green collected Ms. Marvaso's DPNs, typed them into a computer, and gave her a printed copy to sign, usually a day or two after her shift.[138] Ms. Marvaso could not explain why only her DPNs and Ms. Green's were typed, but she speculated it

_____

[137](Marvaso Dep. 25-26, 107.)

[138](*Id.* at 86-87, 97-98.)

could be because they were officers of the company.[139]

Ms. Green testified that she kept Ms. Marvaso's DPNs and her own separate from the other caregivers' because they were co-owners of Luv-n-Care.[140] She also said that, after she finished typing them into a computer, she shredded the originals, because they were written on notepads, and not on regular DPN forms.[141]

Motorists kept a separate list of all discovery materials for Ms. Marvaso. By June 1, 2009, the final discovery cutoff, Plaintiff had produced DPNs in checklist form, timesheets filled out by Ms. Green, but no printed DPNs with Ms. Marvaso's original signature.[142] Then, after repeatedly claiming that Motorists received everything, on July 2, Plaintiff produced a number of computer-generated DPNs signed by Ms. Marvaso.[143] However, several of Ms. Marvaso's timesheets remain outstanding, and despite statements that she wrote her timesheets and DPNs by hand, Plaintiffs never produced handwritten documents for her.[144]

Aside from timesheets and DPNs of dubious authenticity, Plaintiff provides little evidence of Ms. Marvaso's work as a caregiver. According to Motorists, there is not a single handwritten DPN by any caregiver which mentions Ms. Marvaso assisting with

---

[139](*Id.* at 87.)

[140](Green Dep. III, at 238.)

[141](*Id.* at 242.)

[142](Thompson Marvaso Aff. ¶ 6.)

[143](*Id.* at ¶ 7.)

[144](*Id.* at ¶ 18.)

Mr. Whited's care, signing in or off duty, or simply being present.[145]  This is despite the fact that caregivers generally wrote the names of other people they worked with on their DPNs.  When asked if she could explain this, Ms. Marvaso said she mostly worked with her mother.[146]  However, comparing Ms. Marvaso's alleged hours with other caregivers' schedules shows that, if she really gave attendant care, she would have worked mostly with Brenda Biddle, Jake Peterson and Irma Cook. [147]  Ms. Cook and Mr. Peterson deny ever working with Ms. Marvaso.  Mr. Peterson testified that he frequently saw Ms. Marvaso helping her mother with Luv-n-Care paper and computer work, but never serving as a caregiver.[148]  Ms. Cook never worked with Ms. Marvaso either; her understanding was that Ms. Marvaso was "doing paperwork for Luv-N-Care with" Ms. Green.[149]  Brenda Biddle provided attendant care to Mr. Whited in Michigan and in Florida; she is even more emphatic:

> During the entire time I provided attendant care to Gary (June 2003 to February 2009, if not earlier), I never saw Christina Marvaso perform care-giving for Gary Whited.  Ms. Green told me that she did not want her daughter, Tina, to provide care-giving to Mr. Whited.  If care-givers were doing wound or bowel care on Gary, we would have to close the door because Ms. Green did not want Tina and her children to see that.

(Biddle Aff. I ¶ 11; *see also* Biddle Dep. Vol. II, at 171).[150]

---

[145](*Id.* at ¶ 10.)

[146](Marvaso Dep. 117.)

[147](Thompson Marvaso Aff. ¶ 12.)

[148](J. Peterson Dep. 45-47.)

[149](Cook Aff. ¶ 4.)

[150](*See also* L. O'Halloran Aff. ¶ 26 ("I never saw Tina provide any care-giving services to Gary; either in Michigan or in Florida.  Tina did not know how to provide care-

Jennifer Holder testified that Ms. Marvaso's DPNs were manufactured by Tim Rehahn and signed by Ms. Marvaso after the fact:

> Ms. Green asked me to handwrite patient progress notes for Tina Marvaso. She wanted me to write like Tina. She said "try and do it like this." I refused.
>
> Tim Rehahn typed Patient Progress Notes for both Tina Marvaso and Patti Green in front of me. He would take the patient progress notes from the care-givers that actually worked and type them into Patient Progress Notes for Tina and Patti. . . . I read my notes to him while he typed them into Patient Progress Notes for Tina and Patti.
>
> I saw Tina Marvaso sign all of the Patient Progress Notes typed by Tim Rehahn all at one time. She did not even read them. She just signed them.

(Holder Aff. ¶ 19-21.)[151]

### 4. Additional Affidavits by Brenda Biddle

There is one more development to address before turning to the merits. Shortly after Mr. Whited passed away, Brenda Biddle signed two new affidavits, notarized by the same notary as her first. The new affidavits were submitted with Plaintiff's response in opposition to summary judgment, and are obviously intended to cast doubt on the veracity of her original statement. In one, Ms. Biddle states:

---

giving services."); F. Peterson Aff. ¶ 21 ("During the entire time frame that I worked (approximately June of 2006 through November of 2009[)], I never observed Tina Marvaso performing any type of hands-on care-giving for Gary. He was very uncomfortable even having his niece, Tina, around when he was getting bathed. She took Gary on outings no more than two times during the time I worked for Ms. Green. I thought she did this as a family member.").)

[151](*See also* L. O'Halloran Aff. ¶ 21. ("In 2009, Tim Rehahn came down from Michigan and stayed for about two weeks before Easter. . . . I saw Tim Rehahn type Patient Progress Notes on a Gateway computer for Tina Marvaso and Patti while he was in Florida. He was using the other care-givers notes to create the notes. I was present when Tina Marvaso signed the typed Patient Progress Notes that Tim Rehahn made for her.").)

I met with Cheryl Lord in December 2009 regarding Mr. Whited's case against [Motorists].

Mrs. Lord requested that I sign an affidavit. The only affidavit that I signed was hand-written on yellow paper.

The typed affidavit, dated December 4, 2009 . . . , is not the affidavit that I signed.

(Affidavit of Brenda Biddle (Apr. 22, 2010), Pl.'s Ex. 32A [hereinafter Biddle Aff. II], at ¶¶

2-4.) The other affidavit is divisible into two parts. Part one:

I provided nursing and care giving [sic] services to Gary Whited starting in June of 2003 and through February 2009. I provided care giving [sic] services on both the day and night shifts.

During the night shift, I was never alone with Gary Whited. There was always another caregiver present in the home.

Patricia Green was almost always the other caregiver in the home during the night shift.

Whenever I needed assistance with Gary Whited's care or for any emergency on the day or night shift, Patricia Green or another caregiver was always available and present in the home.

I never felt at anytime while I was caring form [sic] Gary Whited that any care I or other caregivers provided was harmful to Gary Whited or improper.

(Affidavit of Brenda Biddle (Apr. 22, 2010), Pl.'s Ex. 32B [hereinafter Biddle Aff. III], at

¶¶ 2-6.) Part two:

When I stated in my previous Affidavit that I did not believe that Tina Marvaso provided caregiver services for Gary Whited, it was based upon my belief that she was not paid for the time she spent with him.

I was present on a number of occasions when Mrs. Marvaso came out to the home to take Gary Whited out for daily outings.

In the past year's [sic] when Gary's condition was better, Mrs. Marvaso would go out with him alone on some occasions.

In the more recent years when Gary's condition had gotten worse, two caregivers were needed to take him on outings. In those instances when Mrs. Marvaso was present, there was a second caregiver who went along on the outings.

(Biddle Aff. III, at ¶¶ 7-10.)

The Court ordered the parties to bring the original copies of Ms. Biddle's affidavits to the August 20 hearing.  Having inspected the three documents side by side, the Court is satisfied that Ms. Biddle signed the first affidavit because the signature matches the other two, and all three documents bear the original stamp of the same notary.

The Court also asked counsel to explain the origins of each affidavit.  Speaking for Motorists, Ms. Lord stated that she had numerous conversations with Ms. Biddle over the course of the litigation, from which she gathered copious notes.  Based on these notes, Ms. Lord drafted the first affidavit and printed it on white paper.  On December 4, 2009, Ms. Lord met with Ms. Biddle at a restaurant in Florida.  After reviewing the affidavit together, they drove to Ms. Biddle's bank, where she signed the affidavit and had it notarized.

James Pelland, the attorney for Gary Whited, Patricia Green and Luv-n-Care, stated that he drafted Ms. Biddle's second and third affidavits.  However, he did not meet with Ms. Biddle, or speak to her, concerning these documents.  Instead, Mr. Pelland explained that he received a telephone call from Ms. Green, who said that Ms. Biddle wanted to make another sworn statement.  Mr. Pelland wrote the affidavits based on Ms. Green's representation of what Ms. Biddle intended to say.  Mr. Pelland did not explain how he sent the unsigned affidavits to Florida, or to whom, but he indicated that the signed documents were mailed back to him by Ms. Green.

Christina Marvaso's attorney, Mr. Robinson, specified that paragraphs 7-10 of the third affidavit are based on a telephone conversation between him and Ms. Biddle.

Mr. Robinson said that when he learned Mr. Pelland was drafting affidavits for Ms. Biddle to sign, he summarized the conversation into four paragraphs, which Mr. Pelland added to the final document.

The Court credits counsel's statements and factors them into its determination on Motorists' motion to dismiss. After closely examining Ms. Biddle's affidavits and hearing how they came about, the Court credits the first document, but rejects the second as not credible. The Court also notes that counsel's explanations cast doubt on the reliability of the third affidavit, especially paragraphs 3-6. However, the Court need not make a determination of credibility concerning Ms. Biddle's third affidavit, because it does not alter the substance of her first statement. For example, saying that there was always another caregiver "in the home" at night does not contradict statements that Ms. Green was asleep. In any case, almost every other caregiver corroborated that Ms. Green made clear she did not want to be bothered at night.

### III. ANALYSIS

Motorists seeks to dismiss Plaintiff's claims or, in the alternative, for the Court to grant summary judgment as to certain aspects of these claims. In addition, Motorists requests summary judgment on its claims for unjust enrichment, overpayment and fraud/misrepresentation against Luv-n-Care, Patricia Green and Christina Marvaso. However, Motorists failed to incorporate any law or argument on its unjust enrichment and overpayment claims, and Plaintiff's response does not address these issues either. Therefore, the Court cannot issue a ruling on these claims.

Motorists also requests a declaratory judgment replacing Ms. Green with a court-appointed guardian to manage Mr. Whited's care, without Ms. Green's participation or

interference.  Since Gary Whited passed away in April 2010, this part of Motorists'
motion is moot.

### A.    Motion to Dismiss

The purpose of discovery is to make relevant information available to litigants, so
that disputes may be resolved with as full and accurate an understanding of the true
facts as possible.  Properly conducted, discovery narrows and clarifies issues in
dispute, reduces the risk of surprise, and gives parties a better sense of their chances of
success, and their options for settlement.  *See Hickman v. Taylor*, 329 U.S. 495, 501,
507 (1947) ("Mutual knowledge of all the relevant facts gathered by both parties is
essential to proper litigation.").

The Supreme Court holds that dismissing an entire action for failure to comply
with discovery orders can be appropriate "not merely to penalize those whose conduct
[deserves it], but to deter those who might be tempted to such conduct in the absence
of such a deterrent."  *Nat'l Hockey League (NHL) v. Metro. Hockey Club*, 427 U.S. 639,
643 (1976); *see also Bass v. Jostens, Inc.*, 71 F.3d 237, 241 (6th Cir. 1995).

Federal Rule of Civil Procedure 37(b) gives courts a range of sanctions against
litigants who fail to cooperate in discovery, or refuse to comply with disclosure orders.
These include:

(i)    directing that the matters embraced in the order or other designated
       facts be taken as established for purposes of the action, as the
       prevailing party claims;
(ii)   prohibiting the disobedient party from supporting or opposing
       designated claims or defenses, or from introducing designated
       matters in evidence;
(iii)  striking pleadings in whole or in part;
(iv)   staying further proceedings until the order is obeyed;
(v)    dismissing the action or proceeding in whole or in part;

(vi)  rendering a default judgment against the disobedient party; or

(vii)  treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A).  Courts may also dismiss an action "[i]f the plaintiff fails to prosecute or to comply with [the Federal Rules of Civil Procedure] or a court order[.]" Fed. R. Civ. P. 41(b).

The same analysis applies when deciding whether to dismiss a case under Rule 37(b)(2) or Rule 41(b).  *United States v. Reyes*, 307 F.3d 451, 458 (6th Cir. 2002).  In both cases, courts must consider the four factors laid out in *Regional Refuse Systems, Inc. v. Inland Reclamation Co.*, namely: (1) whether the non-moving party's failure to cooperate in discovery was due to willfulness, bad faith, or fault; (2) whether the non-moving party's failure to cooperate caused prejudice to the adversary; (3) whether the non-moving party was warned that its conduct could lead to dismissal; and (4) whether less drastic sanctions were imposed or considered.  842 F.2d 150, 154 (6th Cir. 1988), *superseded on other grounds by statute, as stated in Gamby v. Equifax Info. Servs., LLC*, No. 06-11020, 2009 WL 142751, 2009 U.S. Dist. LEXIS 7735, at *5 n.1 (E.D. Mich. Jan. 9, 2009) (unpublished); *Reyes*, 307 F.3d at 458 (*citing Knoll v. Am. Tel. & Tel. Co.*, 176 F.3d 359, 363 (6th Cir. 1999)).  No single factor is dispositive; however, dismissal is appropriate if the district court finds "a clear record of delay or contumacious conduct."  *Schafer v. City of Defiance Police Dep't*, 529 F.3d 731, 737 (6th Cir. 2008) (*quoting Knoll*, 176 F.3d at 363. "'Contumacious' is defined as 'perverse in resisting authority' and 'stubbornly disobedient.'"  *Id.* (*quoting Webster's Third New Int'l Dictionary* 497 (1986)).

In a recent opinion, the Sixth Circuit summarized its Rule 37(b) jurisprudence,

stating:

> We have held, as to the first factor, that the imposition of inherent power sanctions requires a finding of bad faith or conduct that is tantamount to bad faith. We have held, for purposes of the second factor, that a defendant is prejudiced by a plaintiff's failure to cooperate in discovery when the defendant wasted time, money, and effort in pursuit of cooperation which the plaintiff was legally obligated to provide. As for the third factor, we have reversed the dismissal of certain cases where the district court failed to put the derelict parties on notice that further noncompliance would result in dismissal, but as this is just one factor, we have also held that prior warning is not indispensable. Finally, we have instructed courts to look first to an alternative sanction that would protect the integrity of the judicial process, but we have never held that a district court is without power to dismiss a complaint, as the first and only sanction, and we are loath to require the district court to incant a litany of available lesser sanctions. Although we understand this factor to require particular caution in the absence of contumacious conduct, a district court's failure to articulate lesser sanctions is not necessarily fatal.

*Fharmacy Records v. Nassar (Fharmacy II)*, Nos. 08-1607, 08-2201, 2010 WL 2294538, 2010 U.S. App. LEXIS 11626, at *7-8 (6th Cir. June 7, 2010) (unpublished) (internal quotations, citations, and alterations omitted).

On appeal, the district court's dismissal of an action under Rule 37(b) is reviewed for abuse of discretion. *Bass*, 71 F.3d at 241 (*citing NHL*, 427 U.S. at 643) (other citation omitted). "[I]f a party has the ability to comply with a discovery order and does not, dismissal is not an abuse of discretion." *Reg'l Refuse*, 842 F.2d at 154.

In *Fharmacy Records v. Nassar (Fharmacy I)*, the plaintiffs alleged that the defendants used portions of a copyrighted instrumental rhythm line, or "beat," without authorization. 248 F.R.D. 507, 509-10 (E.D. Mich. 2008) (Lawson, J.). When they were deposed, the plaintiffs claimed to possess several important items of evidence, in particular: (1) a CD containing the original beat; (2) a computer zip disk containing the original beat file; (3) a taped conversation between Shelton Rivers, one of the plaintiffs,

44

and a defendant, Salaam Nassar, in which Nassar admitted to taking the beat; and (4) assignment agreements by which Fharmacy acquired rights to the beat. *Id.* at 515-16.

After months of unsuccessful attempts to obtain these materials, the defendants filed a motion to compel production. The court granted the motion, and gave the defendants permission to inspect the computers allegedly used to create the beat and draft the assignment papers. *Id.* at 516-17. The defendants' inquiry yielded these results: (1) the CD had disappeared; (2) the zip disk was entirely blank, and showed signs of having been intentionally "wiped clean" of all data; (3) the taped conversation between Rivers and Nassar was missing; (4) the original assignment agreements were lost, and the only document produced, which was dated 2001, referenced entities that were not formed until 2004; (5) the computer allegedly used in 2001 to record the beat was manufactured in 2004, and several digital files relative the beat's creation were intentionally backdated; and (6); the computer allegedly used to draft the assignment agreement could not be found. *Id.* at 517-20.

Over the course of discovery, the plaintiffs also submitted a declaration by a music producer who falsely claimed to have been present when the beat was created, and proffered a lay witness as a "computer forensic expert." *Id.* at 520-21, 523-25. Finally, the plaintiffs' attorney gave a sworn declaration that, in 2001, the plaintiffs gave him a CD with an original copy of the beat, but that the CD had been lost. However, the plaintiffs testified independently that they did not meet their attorney until 2003. *Id.* at 517.

The defendants moved to dismiss, claiming the plaintiffs engaged in intentional misconduct and committed fraud by fabricating and destroying evidence. *Id.* at 528.

45

Applying the *Regional Refuse* factors, the court granted the motion and dismissed the case with prejudice. The court found that the plaintiffs' conduct had plainly satisfied the requirement of willfulness, bad faith or fault:

> Although some of the events in this litigation might be excused as resulting from mere negligence when viewed in isolation . . . , considering them in the aggregate invariably leads to the conclusion that the plaintiffs and their attorney have conducted a campaign of fraud. . . . If this is not bad-faith litigation, nothing is.

*Id.* at 530. The court also found that the defendants had been prejudiced, because evidence that would have helped them rebut the plaintiffs' claims was either lost, tampered with, or irretrievably compromised. *Id.* at 530. The third factor did not so clearly support dismissal, because the plaintiffs were not warned that their case might be dismissed. However, the court said,

> this factor seems less relevant in a case such as this, where the conduct at issue is not merely contestable, but in contravention of basic notions of fairness and professional responsibility. A party does not need formal notice to know that spoliation of evidence and misrepresentations may lead to dismissal.

*Id.* at 530. Finally, the fourth factor was satisfied because lesser sanctions had been imposed for earlier discovery violations, and because the evidence was "so tainted that pushing onward to a decision on the merits (save granting summary judgment in favor of the defendants . . .) would be practically impossible." *Id.* at 530-31.

The plaintiffs appealed to the Sixth Circuit, but the court was unsympathetic. The court held that dismissal was a proper exercise of discretion, because the district court applied the correct legal standard and reached a reasoned conclusion after weighing the relevant factors. *Fharmacy II*, 2010 U.S. App. LEXIS 11626, at *16.

*Fharmacy Records* is also noteworthy because the plaintiffs' wrongdoing did not

involve violation of a court order.  248 F.R.D. at 529.  Instead, the court dismissed the case under its inherent authority, which involves the same analysis as dismissal under Rule 37(b)(2).  *Id.*

Viewing the record as a whole, and with *Fharmacy Records* as a guide, the four *Regional Refuse* factors weigh decisively in favor of dismissal.

### 1.  Willfulness and Bad Faith

The first *Regional Refuse* factor requires showing that Plaintiff acted willfully and in bad faith.  This element is plainly satisfied.  Before the May 19 Order set a final cutoff date of June 1, 2009, Plaintiff failed to comply with two orders to produce all caregiver timesheets.  On April 17, 2009, Plaintiff gave Motorists two boxes of materials that should have been disclosed by January 7.  Plaintiff never gave a satisfactory reason for missing that deadline, but insisted repeatedly that all materials requested by Motorists had been provided.  At the May 13 hearing, Plaintiff's counsel was careful to specify that she only gave Motorists as much as she got from Ms. Green.  Indeed, on June 1, Motorists received four bankers boxes of additional documents.  The next day, Ms. Green told the Court there was nothing left, and flatly denied that Ms. Marvaso's DPNs were missing.  Nevertheless, on July 2, Motorists received more documents, including several DPNs signed by Ms. Marvaso.

The lack of explanation for these delays was especially troubling because the documents Plaintiff submitted raised serious doubts about their authenticity.  For this reason, the May 19 Order set final deadlines for disclosure, and defined precisely the materials to be produced.  Because of Motorists' substantiated allegation that Plaintiff may be manufacturing evidence, the Court took special care to draft the portion of the

Order dealing with computers, and strictly prohibited their use – or even turning them on – before shipment to Speckin. Lastly, the Court spelled out the consequences of future transgressions in plain, unambiguous language, and warned Plaintiff twice that failure to comply would result in dismissal with prejudice.

Despite these admonitions, Plaintiff ignored simple instructions and violated the May 19 Order more brazenly than any prior decree. The computers were shipped after deadline, and all showed signs of extensive use or tampering. By any standard, Plaintiff's excuses for breaching the Court's directives are weak. Given Plaintiff's track record, they are also conclusive evidence of willfulness and bad faith.

Plaintiff asks the Court to believe that the failure of the Gateway's hard drive was simply a matter of coincidence. Since this was the primary computer used to manage Luv-n-Care's affairs, and arguably the most important one in terms of this lawsuit, this explanation is inherently suspect. The discrepant testimonies of Patricia Green and Tim Rehahn make it even less believable. Ms. Green claims the drive failed some time in April 2009, and that she instructed Mr. Rehahn to replace it and discard the original. Mr. and Mrs. Rehahn both say the problem occurred later, perhaps only a few days before the computer was shipped, and Mr. Rehahn says he switched the drive on his own accord. Mr. Rehahn also says he did not know using the Gateway was prohibited by court order. The fact that Ms. Green failed to tell her "computer guy" about the May 19 Order, is additional evidence of bad faith.

Ms. Green's explanation for not shipping the Pavilion computer is that she believed in good faith that the May 19 Order did not apply to her "personal" computer. She went so far as to tell the Court that the Pavilion had "nothing to do with Luv-n-

Care."[152]  In fact, dozens of files on that computer pertained to Luv-n-Care, and many were opened, altered, and possibly deleted after Plaintiff was notified of the May 19 Order.  Ms. Green's explanation not only strains credulity, it undermines Plaintiff's claim of good faith.  Given the Order's language and the seriousness of the potential sanction, if Ms. Green had sincere doubts about whether to ship the Pavilion, she could have asked the Court directly for clarification, instead of waiting for Motorists to raise the issue.

Finally, Plaintiff admits that hundreds of files were deleted from the DV9000 after May 19, but argues that no user-created files were lost.  Plaintiff's forensic expert opines that, since only computer-generated files were destroyed, it is unlikely any relevant evidence was destroyed.  Even if this is true, the fact remains that someone intentionally deleted these files, in direct violation of a clear order.  That is more than enough to support a finding of willfulness and bad faith.

### 2.    Prejudice to Motorists

The second factor is whether Plaintiff's actions caused Motorists such prejudice that dismissal is justified.  This factor is also met.

Plaintiff admits that some timesheets were not produced, but argues that Motorists suffered no prejudice because the information is available from Paychex, the company Luv-n-Care used for its payroll.  Motorists says Paychex does not have any timesheets for Luv-n-Care, because Ms. Green called in hours verbally by telephone.

Plaintiff also argues that violating the Court's order with regard to computers did not prejudice Motorists, because allegations of missing evidence are purely speculatory,

---

[152](June 2 Hr'g Tr. 16.)

and there is no evidence that any relevant information was destroyed.  However, it is too easy to proclaim after the fact that discarded evidence had no value, especially when dealing with computer files.  *See Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) ("because 'the relevance of . . . [destroyed] documents cannot be clearly ascertained because the documents no longer exist,' a party 'can hardly assert any presumption of irrelevance as to the destroyed documents.'" (*quoting Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1205 (8th Cir. 1982)) (alteration in *Leon*).  This is why the Court categorically prohibited anyone from even touching the computers; it is also the reason Rule 37(b) allows such drastic sanctions for discovery-related misconduct.

Regardless, there is ample non-speculatory evidence of prejudice.  One of Motorists' reasons for examining Luv-n-Care's computers was to determine if the typed DPNs submitted for Mss. Green and Marvaso were created around the same time as the services allegedly provided, or if they were manufactured after the fact.  This information was directly relevant to Motorists' defense and counterclaims.  E-mail traffic between Ms. Green and Mr. Rehahn could have shed light on this as well, but the vast majority of messages are gone, except for a few which appear to support Motorists' claims.  Perhaps most important, the Gateway's contents are almost entirely lost.  By all accounts, this was the main computer in Luv-n-Care's operation.  Plaintiff argues that Tim Rehahn produced copies of some documents, but Mr. Rehahn said he saved only certain files, and no backup was made of the entire hard drive.  Since this was the computer most likely to hold evidence relevant to Motorists' defense, prejudice is undeniable.

The Court notes that prejudice may exist even if no evidence is missing or destroyed. Simply showing that a party "waste[d] time, money, and effort in pursuit of cooperation which [the opponent] was legally obligated to provide" can suffice to establish prejudice. *Schafer*, 529 F.3d at 737 (*quoting Harmon v. CSX Transp.*, 110 F.3d 364, 368 (6th Cir. 1997)). Here, however, the prejudice to Motorists far exceeds loss of time and money. Plaintiff's actions have so grievously compromised the evidentiary record that Motorists can no longer be guaranteed a fair opportunity to defend itself against Plaintiff's claims.

### 3.    Prior Warnings and/or Sanctions

The third *Regional Refuse* factor considers whether Plaintiff was warned that failure to cooperate could result in dismissal, while the fourth factor looks at whether other sanctions were imposed before dismissing the case. Both factors support dismissal.

The May 19 Order unequivocally warned that the Court would dismiss this action with prejudice if Plaintiff failed to comply with this and previous orders. The Court also specified that Motorists' claims against Luv-n-Care, Ms. Green and Ms. Marvaso would continue even if Plaintiff's action was dismissed. (Dkt. #69, at 10, 13.) Ms. Green testified that she recognized this as a warning, and understood the nature of the sanction.[153]

Finally, the Court tried other sanctions before resorting to this one. The May 19 Order allowed Motorists' to re-depose Mss. Biddle and Green at Plaintiff's expense, because earlier depositions were based on an incomplete record. (Dkt. #69, at 11 ¶ 5.)

---

[153](Green Dep. III 101-05.)

The Court also ruled that a presumption of adverse inference would apply for all documents post-marked after June 1, 2009. (*Id.* at 12 ¶ 9.) This sanction would apply to the documents Motorists received on July 2, 2009. However, given the nature and extent of Plaintiff's misconduct, a presumption of adverse inference would not alleviate the prejudice to Motorists if it had to defend under these circumstances.

### 4. Conclusion

The Court's decision is based solely on Plaintiff's objective conduct and the results of Speckin's analysis. The Court does not rely on testimony by former caregivers because, for the most part, their statements relate less to failure to comply with discovery orders than to spoliation of evidence, which Motorists did not invoke as grounds for relief.

The *Regional Refuse* factors unanimously support dismissing Plaintiff's action. In *Fharmacy Records*, Judge Lawson eloquently stated:

> this is not a case involving mere gamesmanship or garden variety discovery abuses. The actions of the plaintiffs . . . in this case are so egregious that they have forfeited their right to proceed in court. The plaintiffs clearly have no respect for the civil justice system, and it would be unfair to require the defendants to defend this case any further.

*Fharmacy I*, 248 F.R.D. at 530.

The Court is cognizant that such drastic sanction should be used only in extreme situations, as a punishment of last resort. *See Regional Refuse*, 842 F.2d at 154. Given the gravity of Plaintiff's misconduct, the Court is satisfied that this is such a case.

### B. Motion for Summary Judgment Against Gary Whited, Patricia Green and Luv-n-Care

Motorists seeks summary judgment on several of Plaintiff's benefit claims, specifically those pertaining to: (1) expenses incurred prior to November 20, 2006; (2) expenses incurred for services that were either unreasonable, unnecessary, or never incurred; and (3) claims for services that were unlawful when provided.

Summary judgment is not a disfavored procedural shortcut, but an integral part of the fair and efficient administration of justice. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Cincom Sys. v. Novelis Corp.*, 581 F.3d 431, 435 (6th Cir. 2009). A court may grant summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P 56(c); *Estate of Smithers v. City of Flint*, 602 F.3d 758 (6th Cir. 2010). The evidence must be construed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Smith v. Cnty. of Lenawee*, 600 F.3d 686, 690 (6th Cir. 2010).

The party seeking summary judgment bears the initial burden of "identifying those parts of the record that demonstrate the absence of any genuine issue of material fact." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (*citing Celotex*, 477 U.S. at 323). If the moving party succeeds, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P 56(e)(2); *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968). The non-moving party may not rest on allegations or denials contained in its own pleadings, and must "do more than show that there is some metaphysical doubt as to the material

facts." *Matsushita*, 475 U.S. at 586; Fed. R. Civ. P 56(e)(2). "'[W]hen the non-moving party presents direct evidence refuting the moving party's motion for summary judgment, the court must accept that evidence as true.' This is the case even when the nonmovant's account is contradictory." *Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010) (*quoting Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)) (other citations omitted).

Once the parties present their evidence, the court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of *material* fact." *Liberty Lobby*, 477 U.S. at 247-48 (emphasis in original); *Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Liberty Lobby*, 477 U.S. at 248; *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 762 (6th Cir. 2008). By contrast, there is no genuine issue if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita*, 475 U.S. at 586; *Savedoff*, 524 F.3d at 762.

In deciding whether to grant summary judgment, the court must avoid weighing conflicting evidence or making credibility determinations. *Schreiber*, 596 F.3d at 333 (*citing Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009)). However,

"[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Motorists seeks summary judgment on several grounds.  First, Motorists claims that Ms. Green and Luv-n-Care were unjustly enriched and overpaid.  However, Motorists failed to incorporate any law or argument on these claims, and Plaintiff's response does not address them either.  Therefore, the Court cannot rule on these claims.

Motorists also seeks summary judgment with regard to Plaintiff's claims for expenses incurred prior to November 20, 2006, based on the "one-year-back" provision of the No-Fault Act.  *See* M.C.L. § 500.3145(1) (a person who sues for unpaid personal-injury insurance benefits cannot recover for any loss incurred more than one year before the action was filed); *Devillers v. Auto Club Ins. Ass'n*, 473 Mich. 562, 574, 586, 702 N.W.2d 539 (2005) (Michigan courts strictly construe and apply the "one-year-back" provision).  Plaintiff's complaint was filed on November 20, 2007, but seeks to recover $9,113.49 for expenses allegedly incurred prior to November 20, 2006.[154]  Plaintiff's claim is time-barred under § 500.3145(1); however, since Plaintiff's action is dismissed, the issue is moot.

Lastly, Motorists alleges that, from June 2003 to April 2010, Patricia Green and Luv-n-Care fraudulently misrepresented how much care Mr. Whited required and received.  During this period, Motorists paid $3,804,264.00 for services to Mr. Whited,

---

[154](Thompson Aff. ¶ 6; Def.'s Ex. D17(a).)

the equivalent of one full-time HTA and one full-time HHA. Motorists seeks to recover $1,033,527.71 in funds for services that were either illegally rendered, unnecessary, or not provided at all. This claim is ripe for discussion.

### 1. Fraud/Misrepresentation Claim

In Michigan, the plaintiff in an action for fraud must establish:

> that the charged party made a material representation; (2) that it was false; (3) that when he or she made it he or she knew it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he or she made it with the intention that it should be acted upon by the other party; (5) that the other party acted in reliance upon it; and (6) that the other party thereby suffered injury.

*City of Novi v. Robert Adell Children's Funded Trust*, 473 Mich. 242, 254 n.8, 701 N.W.2d 144 (2005) (*citing Scott v. Harper Recreation, Inc.*, 444 Mich. 441, 446 n.3, 506 N.W.2d 857 (1993)); *accord Candler v. Heigho*, 208 Mich 115, 121; 175 N.W. 141 (1919). The plaintiff must also show that its reliance on the defendant's representations was reasonable. *Cooper v. Auto Club Ins. Ass'n*, 481 Mich. 399, 414, 751 N.W.2d 443 (2008) (*citing Foreman v. Foreman*, 266 Mich. App. 132, 141-42; 701 N.W.2d 167 (Ct. App. 2005)). Furthermore,

> fraud must be established by clear and convincing evidence and must never be presumed. However, fraud may be established by *circumstantial evidence*. In other words, fraudulent or wrongful conduct may be inferred from other evidence.

*Foodland Distribs. v. Al-Naimi*, 220 Mich. App. 453, 457-58, 559 N.W.2d 379 (Ct. App. 1996) (*citing Hi-Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 336; 247 N.W.2d 813 (1976); *Goldberg v. Goldberg*, 295 Mich. 380, 384; 295 N.W. 194 (1940)) (emphasis in original).

The party who pursues a claim for fraud has the burden of proving damages with reasonable certainty. *Hofmann v. Auto Club Ins. Ass'n*, 211 Mich. App. 55, 108; 535 N.W.2d 529 (Ct. App. 1995) (citation omitted). As with other tort actions, the plaintiff may recover only for injuries which result "directly from [the tortfeasor's] wrongful act, whether foreseeable or not, provided the damages are the legal and natural consequences of the wrongful act, and . . . might reasonably have been anticipated." *Sutter v. Biggs*, 377 Mich. 80, 86, 139 N.W.2d 684 (1966). There is no recovery for remote, contingent, or speculative damages. *Id.* However,

> damages are not speculative merely because they cannot be ascertained with mathematical precision. It is sufficient if a reasonable basis for computation exists, although the result be only approximate. Moreover, the certainty requirement is relaxed where the fact of damages has been established and the only question to be decided is the amount of damages.

*Ensink v. Mecosta Cnty. Gen. Hosp.*, 262 Mich. App. 518, 525, 687 N.W.2d 143 (Ct. App. 2004) (*quoting Hofmann*, 211 Mich. App. at 108) (internal citations omitted). In particular, courts do not "require a mathematical precision in situations of injury where . . . it is defendant's own act or neglect that has caused the imprecision." *Purcell v. Keegan*, 359 Mich. 571, 576, 103 N.W.2d 494 (1960) (internal quotes and citation omitted).

Motorists' fraud allegations are divisible into three categories. Motorists contends there is no genuine issue of material fact that Plaintiff fraudulently misrepresented: (1) whether certain treatments or services received by Mr. Whited were legally rendered, as defined by M.C.L. § 500.3157; (2) whether attendant-care services paid for by Motorists constituted "allowable expenses" under M.C.L. § 500.3107; and (3)

the proper amount of attendant care required by Mr. Whited. The Court addresses each claim separately.

### a. Claims under M.C.L. § 500.3157

Under the No-Fault Act, treatment for personal injuries must be lawfully rendered to be covered by insurance. *See* M.C.L. § 500.3157 ("A physician, hospital . . . or other person or institution *lawfully rendering treatment* to an injured person for an accidental bodily injury covered by personal protection insurance . . . may charge a reasonable amount for the products, services and accommodations rendered.") (emphasis added).

One requirement of lawfulness is that, if a given product or service is regulated by the state, the person providing that product or service must conform to all applicable laws and regulations, including licensing requirements. *Hofmann*, 211 Mich. App. at 64 ("only treatment lawfully rendered, including being in compliance with licensing requirements, is subject to payment as a no-fault benefit."); *Cherry v. State Farm Mut. Auto. Ins. Co.*, 195 Mich. App. 316, 320, 489 N.W.2d 788, 790 (1992) (lawful practice of acupuncture requires a license, therefore, "unless acupuncture is administered by a licensed physician, it is not lawfully rendered."); *see also Miller v. Allstate Ins. Co.*, 275 Mich. App. 649, 656, 739 N.W.2d 675, 680 (2007) ("The licensing of an individual . . . who personally provides services to a client or patient, has a direct correlation to the rendering of treatment.")

Although they do not cite to any statute or case law, both parties agree that family members like Ms. Green are not subject to the licensing requirement. Therefore, services that require a license to be legally provided by a caregiver employee are considered lawfully rendered when performed by Ms. Green. However, Motorists

alleges that many treatments received by Mr. Whited were actually provided by caregivers who were not licensed to perform them. Indeed, most of the caregivers who provided affidavits voluntarily admit that they performed certain tasks, such as administering medications, flushing PICC lines and changing ventilator settings, for which they were not licensed.[155] Motorists claims these services were unlawfully rendered, and argues it should be fully reimbursed for each time this occurred during the Luv-n-Care period (from October 2007 onward).

Plaintiff responds that it does not seek higher compensation for services that require special licensing. For instance, Plaintiff argues, Luv-n-Care does not claim Motorists should pay more for every time Mr. Whited received certain treatments because caregivers licensed to provide such services command higher wages. Instead, Plaintiff claims only to seek reimbursement for attendant-care services actually provided to Mr. Whited. Plaintiff also disputes whether the services performed by the caregivers required any particular license. The Court need not address these arguments, however.

From June 2003 until April 2010, Motorists paid on average $12,222 every other week for Mr. Whited's attendant care. This rate is equivalent to two round-the-clock caregivers, one HTA and one HHA. Motorists does not dispute that the individuals who took care of Mr. Whited did so legally, only whether they were licensed to perform certain tasks. However, Motorists cites no law (and the Court is not aware of any) under which the unlawful performance of a particular act vitiates other services rendered legally by the same person. Unless such a law exists, Motorists cannot refuse

_____

[155](*See* Biddle Aff. ¶ 13; Young Aff. ¶ 4; Simeon Aff. ¶ 8; Holder Aff. ¶ 14; F. Peterson Aff. ¶ 18; Boggs Aff. ¶ 17; Kirby Aff. ¶ 10; Williams Aff. ¶¶ 7-8; Cruz Aff. ¶ 7; Banton Aff. ¶ 8.)

to pay Mr. Whited's caregivers for their services simply because, at some point during their shift, they performed an act for which they were not licensed.

There is one exception, however. Brian O'Halloran testified that Ms. Green hired him to work the night shift in March 2010, despite the fact that he had no nursing license and no caregiving experience whatsoever.[156] Mr. O'Halloran's services clearly run afoul of Michigan's licensing requirement; therefore, as a matter of law, they were not lawfully rendered under M.C.L. § 500.3157. The Court holds that Motorists is entitled to full reimbursement for all attendant-care hours credited to Mr. O'Halloran.

### b. Claims under M.C.L. § 500.3107

Motorists argues that Plaintiff knowingly misrepresented how much attendant care was necessary for Mr. Whited on a daily basis, as well as the amount of care he actually received. Under Michigan law, no-fault insurance benefits are available for "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." M.C.L. § 500.3107(1)(a). To obtain reimbursement of an "allowable expense," the insured must prove that: (1) the service is reasonably necessary, (2) the cost of the service is reasonable; and (3) the expense was actually incurred. *Nasser v. ACIA*, 435 Mich. 33, 49; 457 N.W.2d 637 (1990); *Williams v. AAA Mich.*, 250 Mich. App. 249, 258, 646 N.W.2d 476 (Ct. App. 2002). A court may deny liability as a matter of law for expenses that are neither reasonable nor necessary. *Nasser*, 435 Mich. at 51.

Motorists' claims of fraud are best addressed on an individual basis. However,

---

[156](B. O'Halloran Aff. ¶¶ 2, 7.)

the Court begins by considering two issues common to all claims: first, whether Motorists acted in reliance on Plaintiff's representations in making attendant care payments, and second, assuming fraudulent conduct occurred after October 2007, whether the Court can pierce Luv-n-Care's corporate veil to reach Patricia Green.

Plaintiff contends that Motorists cannot establish the reliance element of common-law fraud because from January 2008 onward, it paid $12,222 regardless of Luv-n-Care's actual costs. Plaintiff reasons that, since Motorists paid the same fee no matter what Luv-n-Care claimed its expenses to be, Motorists cannot show that it relied on Luv-n-Care's representations.

Plaintiff's argument fails. Maria Arezzo testified that, before Luv-n-Care existed and this litigation began, Ms. Green called every other week to verbally communicate the amount of attendant care Mr. Whited received.[157] Ms. Arezzo relied on Ms. Green's representations to issue the checks that paid for Mr. Whited's care. After Plaintiff began this action, Motorists' attorney advised Ms. Arezzo to pay $12,222, the amount corresponding to two full-time caregivers.[158] Therefore, even as Motorists questioned the cost of Mr. Whited's attendant care, it continued to rely on Ms. Green's representation that two caregivers were needed at all times.

As discussed in the previous section, before Luv-n-Care existed, Ms. Green called Maria Arezzo every other week and told her how many hours of attendant care

---

[157](Arezzo Dep. 312-13.)

[158](*Id.* at 284-85, 315.)

were allegedly provided during that period.[159]  Therefore, it is undisputed that, from June

2003 to June 2007, Ms. Green made the representations upon which Motorists relied to

pay for Mr. Whited's attendant care.

From October 2007 onward, Luv-n-Care was the entity responsible for giving

Motorists the information necessary to pay Mr. Whited's caregivers.  Luv-n-Care is a

closely-held corporation with two living shareholders: Patricia Green and Christina

Marvaso.  "Michigan courts typically consider corporations legally distinct from their

shareholders, even if a single shareholder owns all the stock."  *Dep't of Consumer &*

*Indus. Servs. v. Dineschandra Shah*, 236 Mich. App. 381, 393, 600 N.W.2d 406 (Ct.

App. 1999) (citation omitted). However,

> [a] court's treatment of a corporate entity clearly rests on notions of equity,
> whether it is an action at law or at equity.  Equity has the power to look
> through and behind the legal entity of corporate existence.  Piercing the
> corporate veil is appropriate when there is evidence of fraud, illegality, or
> injustice.  Each case involving disregard of the corporate entity rests on its
> own special facts.

*Id.* (quotes and citations omitted).

Michigan courts recognize several ways to determine whether it is proper to

pierce the corporate veil.  In *Klager v. Robert Meyer Co.*, the state supreme court

endorsed a totality-of-the-circumstances approach, stating: "the entire spectrum of

relevant fact forms the background for such an inquiry, and the facts are to be assessed

in light of the corporation's economic justification to determine if the corporate form has

been abused."  415 Mich. 402, 411-12; 329 N.W.2d 721(1982).  Subsequently, the

Court of Appeals proposed a narrower standard:

---

[159](*Id.* at 312-13.)

62

> First, the corporate entity must be a mere instrumentality of another entity or individual. Second, the corporate entity must be used to commit a fraud or wrong. Third, there must have been an unjust loss or injury to the plaintiff.

*SCD Chemical Distribs., Inc. v. Medley*, 203 Mich. App. 374, 381; 512 N.W.2d 86 (1994) (citation omitted).  This formulation seems to be gaining popularity among Michigan courts, with tacit approval of the Supreme Court.  *See Foodland Distribs.*, 220 Mich. App. at 456-60, *leave to appeal denied*, 454 Mich. 895, 562 N.W.2d 787 (1997).

The evidence unequivocally shows that Luv-n-Care was Ms. Green's instrumentality.  For example, Ms. Green was the only person to communicate with Motorists for all issues regarding Mr. Whited's care.  Former caregivers unanimously testified that, from June 2003 until April 2010, they were hired, supervised, paid and fired by Ms. Green.  Caregivers who said Ms. Marvaso did clerical work for Luv-n-Care described her as Ms. Green's assistant, and Ms. Marvaso herself testified that she answered to her mother.[160]  Lastly, there is no question that Tim and Elizabeth Rehahn worked for Ms. Green.  In the context of this lawsuit, Luv-n-Care cannot be distinguished from Ms. Green.

The fraud and injury prongs of the veil-piercing test overlap with the merits of Motorists' fraud/misrepresentation claim against Ms. Green.  Thus, if the Court finds that Motorists is entitled to summary judgment, the elements required to pierce Luv-n-Care's corporate veil are also met.

Motorists contends that there are several specific instances in which it cannot be required to pay for attendant care.  Specifically, Motorists argues it is not liable for

---

[160](*See* J. Peterson Dep. 45-47; Cook Aff. ¶ 4; Marvaso Dep. 86-87, 97-98, 130-31.)

attendant care services allegedly provided: (1) by Tim and Elizabeth Rehahn; (2) when Mr. Whited was hospitalized in intensive care; (3) by Christina Marvaso; (4) at night by the second caregiver; and (5) for hours when Mr. Whited was alone and unattended. In addition, Motorists argues it should not be required to pay more than 28 hours of attendant care per day, the equivalent of one full-time caregiver, plus four hours by an assistant.

The Court addresses each claim individually.

### i.    Attendant Care during Hospitalizations

Motorists disputes charges for attendant care provided when Mr. Whited was in the hospital, particularly when he was placed in the hospital's Intensive Care Unit ("ICU"). From 2007-2008, Mr. Whited was hospitalized on four occasions. Each time, Luv-n-Care billed Motorists the cost of two full-time caregivers, for a total of $19,459.48.[161] Motorists supplies no data on hospital stays after 2008, but the Court is personally aware that Mr. Whited was hospitalized for extended periods in 2009 and 2010.

Motorists argues that attendant-care services were neither medically necessary nor reasonable when Mr. Whited was in intensive care. Motorists' experts generally agree, because ICUs provide 24 hour, one-on-one nursing care and respiratory therapy care, management by critical-care specialized physicians, and staff to help move and bathe the patient.[162] However, Dr. LaBan notes that some spinal cord patients require "cough assistance," suggesting that in some cases, attendant care may be

---

[161](Thompson Aff. 9.)

[162](Doble Report 3; LaBan Report 2.)

necessary.[163]  Motorists notes that Mr. Whited's own primary care physician testified that it was not medically necessary for Ms. Green to care for Mr. Whited when he was in the hospital.[164]

Plaintiff rejects Motorists' position and argues that it was medically and necessary to have Luv-n-Care personnel present at the hospital to assist with Mr. Whited's care.  Plaintiff provides no case law on point, but submits two letters from doctors who treated Mr. Whited when he was hospitalized in October and November 2009.  One document is a note scribbled on a prescription slip from Kindred Hospital Bay Area St. Petersburg, and signed by Dr. W. Abel.[165]  Dr. Abel states: "Patty Green and the private duty staff that care for Mr. Gary Whited perform at an exemplary level."[166]  However, he does not mention or assess the medical necessity of having two attendant caregivers present on a 24-hour basis in an ICU setting.  The Court disregards this "letter" as irrelevant to the question at hand.

The second document is an actual letter signed by Dr. Todd K. Horiuchi of Sarasota Memorial Hospital.[167]  Dr. Horiuchi states that caregivers are necessary

---

[163](LaBan Report 2.)

[164](Deposition of Osvaldo Mardones, Def.'s Ex. B6, at 97.)  Motorists also provides three affidavits signed by Ms. Green in 1986, each stating that Mr. Whited does not require attendant-care help when he was hospitalized as an inpatient.  (Def.'s Ex. D13.)  These affidavits show Mr. Whited did not require such services in 1986, and arguably that Ms. Green knew Motorists refuses to pay for attendant care during inpatient hospital stays.  (*See also* Biddle Aff. I, at 8.)

[165](Pl.'s Ex. 26.)

[166](*Id.*)

[167](Pl.'s Ex. 25.)

because Mr. Whited "requires frequent suctioning and use of a cough-assist device that only his caregivers are trained in using (hospital staff are not trained in its use) and he cannot call out for assistance on his own."[168]

Dr. Horiuchi's letter is not a signed affidavit, and therefore it carries little weight on summary judgment. Furthermore, Plaintiff does not provide evidence that hospitals allow non-staff caregivers to administer any treatment to patients in their care. To the contrary, given the potential liabilities, it his highly unlikely that any hospital would take such a risk.[169]

For these reasons, the Court holds that, as a matter of law, Mr. Whited did not require any attendant-care service when he was in intensive care. Motorists is entitled to full reimbursement of all payments corresponding to periods when Mr. Whited was hospitalized in intensive care between 2003 and 2010.

### ii. Second Caregiver on Midnight Shift

Motorists argues that there was never more than one person with Mr. Whited during the midnight shift. Out of thousands of DPNs, fewer than five mention a second caregiver during the night, and it seems they were created for training purposes.[170] By all accounts, including her own, Ms. Green should have been the second person on

---

[168](*Id.*)

[169]In fact, one caregiver who watched over Mr. Whited at Sarasota Hospital testified: "The hospital staff did not want us to do anything *because they said it would not be covered under their insurance.*" (Boggs Aff. ¶ 12 (emphasis added).)

[170](Thompson Aff. ¶ 16.)

night duty; however, former caregivers unanimously testified that she spent each night asleep in her own bed.[171]

Plaintiff argues that Motorists is required to pay Ms. Green for alleged services on the midnight shift, even if she was not constantly attending to Mr. Whited. Plaintiff relies on two Michigan Court of Appeals cases, *Brown v. Eller Outdoor Adver. Co.*, 111 Mich. App. 538, 314 N.W.2d 685 (Ct. App. 1981), and *Morris v. Detroit Bd. of Educ.*, 243 Mich. App. 189, 622 N.W.2d 66 (Ct. App. 2000) (per curiam). *Brown* and *Morris* are not no-fault cases, but claims for benefits under Michigan's Workers' Disability Compensation Act ("WDCA"), M.C.L. § 418.101 *et seq.*[172] Nonetheless, they are instructive.

In *Brown*, the plaintiff sustained catastrophic spinal cord injuries which rendered him unable to move any part of his body below his neck. 111 Mich. App. at 539. The plaintiff's wife was his primary caregiver, with part-time assistance from a nursing aide. *Id.* at 540. Despite the seriousness of his condition, the plaintiff could be left alone for periods of time. *Id.* at 541. On these occasions, his wife remained "on call," but she also performed household chores or other activities. *Id.* at 541. The defendants argued that they were only required to pay for time the plaintiff's wife spent actually caring for

---

[171](*See* Biddle Aff. I, at ¶ 3; Young Aff. ¶ 6; Holder Aff. ¶ 5; F. Peterson Aff. ¶ 5; Boggs Aff. ¶¶ 4-5, 14; Kirby Aff. ¶ 4; Cruz Aff. ¶¶ 4, 9; B. O'Halloran Aff. ¶ 7; Banton Aff. ¶ 6; Kaczor Aff. ¶ 4.)

[172]In relevant part, the WDCA states: "The employer shall furnish, or cause to be furnished, to an employee who receives a personal injury arising out of and in the course of employment, reasonable medical, surgical, and hospital services and medicines, or other attendance or treatment recognized by the laws of this state as legal, when they are needed." M.C.L. § 418.315(1).

him, not when she was merely on call. *Id.* at 541-42. The court of appeals rejected this argument, and held that on-call time was properly compensable. *Id.* at 543. The court reasoned:

> the fact that a spouse is able to perform household tasks during those times when not actually in attendance with the patient is irrelevant under the circumstances of this case. If the services were provided by someone other than plaintiff's wife, that person would, we assume, pursue his or her own interests within the limits of the job. Such person might read, knit, watch television, or nap during those times in which he or she is simply "on call". The fact that Mrs. Brown might use her "on call" time to perform household tasks does not alter the "nature of the service provided" or the "need" for the service.

*Id.* at 543. Since it was undisputed that the plaintiff required 24-hour care, and that his wife provided seventeen of those caregiving hours, the court held that she should be compensated for that amount. *Id.*

In *Morris*, a heart attack left Charles Reagan bedridden most of the time, but he was able to perform some activities without assistance. 243 Mich. App. at 190. Florence Reagan cared for her husband outside of her full-time job, but he was able to function alone the rest of the time. *Id.* at 191. A workers' compensation magistrate determined that Mrs. Reagan was "on call" full-time to provide care for her husband, except when she was at work. *Id.* at 191-92. The Workers' Compensation Appellate Commission ("WCAC") reversed, and, applying a "stop-watch" approach, held that Mrs. Reagan should be paid only for time actually spent caring for her husband. *Id.* at 192. The court of appeals reversed, stating:

> *Brown* established a legal principle that can be applied in every case, namely, that on-call care is compensable under the statute. Surely we can see the possibility that, over time or because of specific events like surgery, an injured worker may need more or less on-call attendant care during certain times. Whether this care is compensable depends solely on

68

whether it was necessary.  In other words, compensation does not depend on whether the care can be categorized as "around-the clock" or part-time as long as it is necessary.

That the injured worker in *Brown* may have required more on-call care than Charles Reagan is irrelevant to the WCAC's decision to refuse to compensate Florence Reagan for *necessary* on-call care, no matter how much or how little of this on-call care she provided. . . .

. . .

On remand, the WCAC is still free to conclude that Charles Reagan only *needed* part-time care and, therefore, Florence Reagan was only entitled to compensation for the part-time care she rendered, whether performing actual services or being on-call.

*Id.* 197-99 (footnote omitted) (emphasis in original).

As *Brown* and *Morris* make clear, under the WDCA, a family caregiver is entitled to compensation for on-call attendant care, as long as it is necessary.

Motorists contends that *Brown* and *Morris* are irrelevant to this case, because they arose under the WDCA instead of the No-Fault Act.  Neither party submits any case law on whether courts deciding issues under the No-Fault Act can turn to WDCA jurisprudence for guidance.  However, the WDCA and the No-Fault Act create statutory schemes which regulate and administer similar types of insurance claims and benefits.  Furthermore, *Brown* and *Morris* are factually very similar to this case, and the Court of Appeals' rulings are straightforward and well reasoned.  For these reasons, this Court finds *Brown* and *Morris* persuasive.

Plaintiff argues that, like the spouses in *Brown* and *Morris*, Ms. Green was always on call at nighttime, and, therefore, she is entitled to compensation as the second attendant caregiver on that shift.  Plaintiff appears to equate "on call" with "available," but *Brown* makes clear that these are not identical terms.  As the court describes it, an on-call caregiver is not someone who is simply available to help if

69

necessary, but a person who "pursue[s] his or her own interests [such as reading, knitting, watching television, or napping] *within the limits of the job*." 111 Mich. App. at 543 (emphasis added).

According to Mr. Whited's former caregivers, Ms. Green did not read, watch television, do housework and laundry, or even nap on the midnight shift. Instead, they unanimously state that: (1) there was only one person attending to Mr. Whited during the entire night; (2) that person was never Ms. Green; and (3) Ms. Green spent every night asleep in her bed, in another part of the house.[173] This is clearly not the type of activity that *Brown* and *Morris* envisioned one could accomplish "within the limits of the job."[174]

Moreover, evidence concerning Ms. Green's alleged availability during the midnight shift is limited and contradictory. Mari Young states, without elaborating, that she could wake Ms. Green up at night if she needed help.[175] Brenda Biddle's "revised" affidavit similarly states that she was never alone on the night shift, because: "Patricia Green or another caregiver was always available and present in the home."[176] Neither Ms. Young nor Ms. Biddle cites any particular occasion when Ms. Green's assistance was actually required. Frank Peterson also states that he could get Ms. Green if

---

[173](*See* Biddle Aff. I ¶ 3; Young Aff. ¶ 6; L. O'Halloran Aff. ¶ 5; Holder Aff. ¶ 5; F. Peterson Aff. ¶¶ 4-5; Boggs Aff. ¶¶ 4-5, 14; Kirby Aff. ¶ 4; Cruz Aff. ¶ 4; B. O'Halloran Aff. ¶ 7; Banton Aff. ¶ 6; Kaczor Aff. ¶ 4.)

[174]Ms. Green would undoubtedly agree, since she strictly forbade caregivers from sleeping during their shifts. (*See* Biddle Aff. I, at ¶ 4; Boggs Aff. ¶ 13; L. O'Halloran Aff. ¶ 5.)

[175](Young Aff. ¶ 6.)

[176](Biddle Aff. III, at ¶ 5.)

needed, but specifies that this happened "no more than approximately three or four times" in a period of over three years.[177] Jennifer Holder testified that Ms. Green strongly disliked being woken up, and was so moody and unpredictable that Ms. Holder called Mr. Peterson to help her if she needed assistance.[178] Jesusita Cruz testified that she had great difficulty waking up Ms. Green, and that, when roused, Ms. Green was "extremely irritated" and often increased Mr. Whited's dosage of medication "so he would not bother her."[179] Other caregivers who worked the midnight shift do not even mention Ms. Green as "available" at night.[180]

The declarations of Mr. Whited's former caregivers establish, beyond any question of material fact, that Ms. Green was not an on-call caregiver during the midnight shift. For this reason, the Court holds that, as a matter of law, even if on-call care is compensable under the No-Fault Act, and even if Gary Whited required attendant care from two people at night, he did not receive that care from Patricia Green; therefore, the expense of having a second caregiver on the night shift was never actually incurred. *Nasser*, 435 Mich. at 49.

Motorists is entitled to recover all payments made to Ms. Green for attendant care allegedly provided on the night shift, from June 2003 to April 2010.

### iii.  Attendant Care When Caregivers did Housework

---

[177](F. Peterson Aff. ¶ 5.)

[178](Holder Aff. ¶ 5.)

[179](Cruz Aff. ¶ 9.)

[180](*See* Biddle Aff. I at ¶ 4; O'Halloran Aff. ¶ 5; Kirby Aff. ¶ 4; Boggs Aff. ¶¶ 4-5.)

Motorists argues that it is not required to pay attendant-care benefits for hours when caregivers did housework for Ms. Green. The Court agrees.

Nearly every caregiver who furnished an affidavit testified that, in addition to caring for Mr. Whited, they were required to perform a variety of household tasks for Ms. Green.[181] Some were told upon hiring that performance of these chores was an integral part of the job, and a condition of their continued employment.[182] The Court cannot see any manner in which these chores could aid Mr. Whited's care, recovery, or rehabilitation, and Plaintiff does not suggest any. Furthermore, this Court's ruling that Motorists cannot refuse to pay for on-call attendant care under the No-Fault Act does not mean that Ms. Green is entitled to free daily housecleaning services. In *Brown*, the person who did housework during on-call time was the plaintiff's wife. 111 Mich. App. at 541. This Court finds it safe to assume that the Michigan Court of Appeals would have ruled differently if Ms. Brown hired an attendant caregiver and required that person to do housekeeping chores at the insurer's expense.

While it is relatively easy to determine whether housework qualifies as an allowable expense, it is more difficult to estimate how much caregiving time was actually devoted to these chores. Mr. Whited's former caregivers do not state what portion of

---

[181]According to caregivers, they were assigned nearly every household task imaginable, including, but not limited to: washing dishes, doing laundry, moping floors, cleaning windows and blinds, cleaning the refrigerator, preparing for parties, cooking and bartending for parties, cleaning after parties, polishing silver, blowing leaves from the driveway, and power washing and reorganizing the garage. (*See* Biddle Aff. I, at ¶ 3; Young Aff. ¶ 12; Antoine Aff. ¶¶ 5-6; Simeon Aff. ¶¶ 3-4; O'Halloran Aff. ¶¶ 6-7, 19; Holder Aff. ¶¶ 7-8; F. Peterson Aff. ¶¶ 4, 6, 15; Kirby Aff. ¶ 7; Williams Aff. ¶¶ 5-6; Cruz Aff. ¶ 6; Banton Aff. ¶ 7; Kaczor Aff. ¶ 10.)

[182](*See* Simeon Aff. ¶ 4; Cook Aff. ¶ 2.)

their shifts consisted of housekeeping work, and for obvious reasons, such activities were not recorded on timesheets and DPNs. As a result, the Court believes this question should be left for the factfinder to decide.

As a matter of law, the Court holds that housecleaning services provided by Mr. Whited's attendant caregivers were not reasonably necessary to his care, and, therefore, they were not allowable expenses under M.C.L. § 500.3107(1)(a). The Court further holds that Plaintiff knowingly and falsely represented to Motorists that caregivers performed services constituting an allowable expense when, in fact, they did housekeeping work. However, the Court leaves for the factfinder to decide, what portion of a typical caregiver's shift was devoted to housework.

### iv. Attendant Care When Second Caregiver was Dismissed

Motorists contends that Plaintiff cannot seek attendant-care benefits for times when caregivers were sent home early. Two caregivers testified that the second caregiver on the day shift was often dismissed early.[183]

If a person hired to procure a particular service or treatment is not available to actually provide it, the expense associated with that service or treatment cannot be "actually incurred," and thus, it is not allowable under M.C.L. § 500.3107(1)(a). Therefore, as a matter of law, Motorists is not required to pay for attendant care when Mr. Whited's second caregiver was sent home before the end of the day shift. The Court also holds that, if it was common practice (and not an exceptional occurrence) for Ms. Green to dismiss the second caregiver early, then, as a matter of law, Plaintiff

---

[183] (*See* Biddle Aff. I, at ¶ 3; L. O'Halloran Aff. ¶ 19.)

misrepresented whether attendant-care services paid by Motorists were actually dispensed. However, for reasons stated in the preceding section, the Court leaves for the factfinder to decide whether and how often the second caregiver on the day shift was sent home early, and how many attendant-care hours were not provided as a result.

### v. Attendant Care When Mr. Whited was Unattended

Motorists argues that it should be reimbursed for any attended-care services allegedly provided when Mr. Whited left the home unaccompanied by any caregiver. Several former caregivers testified that Mr. Whited frequently went alone to friends' houses and to bars, often returning inebriated, high, or both.[184] However, testimonies differ on whether Mr. Whited was always unaccompanied during his escapades.[185] Moreover, it is difficult to tell how often and how long Mr. Whited was absent, and to what extent caregivers could have provided assistance during these outings. For instance, it may be argued that, if Mr. Whited spent the afternoon with a friend next door who could call for assistance if necessary, his caregivers were simply "on call," available to attend to his needs at any moment.

When a person hired to procure a particular service or treatment is unable to provide it though no fault of his or her own, the expense associated with that service cannot be "actually incurred"; thus, it is not allowable under M.C.L. § 500.3107(1)(a).

---

[184](*See* Antoine Aff. ¶ 7; L. O'Halloran Aff. ¶ 15; F. Peterson Aff. ¶¶ 4, 13; Holder Aff. ¶ 12; Kaczor Aff. ¶¶ 5-8.)

[185](*Compare* Antoine Aff. ¶ 7 (stating she was not allowed to accompany Mr. Whited), *and* Kaczor Aff. ¶ 5 (same), *with* F. Peterson Aff. ¶¶ 4, 13 (stating he took Gary to his friend's house, and that "[m]ost of the time when Gary went [out], he had at best only one care-giver with him").)

Therefore, if it was common for Mr. Whited to abscond without caregiver supervision, then, as a matter of law, Plaintiff misrepresented whether attendant-care services were actually provided at those times, and corresponding expenses must be refunded to Motorists. However, the evidence is not sufficient to establish how much time Mr. Whited spent on solitary excursions where his caregivers could not, if necessary, provide assistance equivalent to what they could offer at home. Accordingly, the Court leaves for the factfinder to decide how many attendant-care hours Motorists is entitled to recover.

### vi. Services Provided by the Rehahns; Luv-n-Care's Overhead

Motorists contends that only expenses relating to attendant-care services are reimbursable under the No-Fault Act. However, from August to October 2008, Luv-n-Care charged Motorists $7,137.25 for 435.25 hours of CNA services allegedly provided by Elizabeth Rehahn.[186] Mrs. Rehahn testified that she only did clerical work for Luv-n-Care, and never provided any service as a CNA.[187] Mrs. Rehahn also admitted that Luv-n-Care billed Motorists under her name for clerical and computer work performed by her husband Tim.[188] Motorists argues that Luv-n-Care must refund all payments received for services attributed to Mr. and Mrs. Rehahn.

Plaintiff admits that clerical work and other similar services "are not costs which

---

[186](Thompson Aff. ¶ 9; Def.'s Ex. D7.)

[187](E. Rehahn Dep. 73-75, 106.)

[188](*Id.* at 79, 87-88, 90-91, 106.)

can be directly reimbursed by [Motorists] . . . under the No-Fault Act."[189]   However,

Plaintiff states that expenses attributed to the Rehahs properly represent the costs of a

home health care agency.  Plaintiff provides evidence that, when Health Partners was in

charge of Mr. Whited's attendant care, it billed Motorists more than twice the amount

Motorists would pay Luv-n-Care for the same job, performed by the same person.[190]

Indeed, Motorists acknowledges that health care agencies like Health Partners are paid

higher rates to cover their overhead, which includes advertising for caregivers, training,

interviewing personnel, billing, payroll, and various other administrative expenses.  In

addition, the Court notes that Motorists does not seek reimbursement of expenses

attributed to Karla Schrand, despite the fact that she was not a licensed caregiver and

that she only did administrative work for Luv-n-Care.[191]

The Court finds that Plaintiff raises a genuine issue of material fact as to whether

a home health care agency like Luv-n-Care can demand higher rates for caregiving

services than someone working alone, and whether Motorists typically pays higher rates

to these entities.  If so, it is possible that some of the billing and computer work

performed by Elizabeth and Tim Rehahn could have been paid for by higher attendant-

care payments.  However, even if it this is true, the factfinder will decide whether the

hours attributed to the Rehahns are accurate, and whether their work served a

---

[189](Pl.'s Br. Opp'n 28 n.11.)

[190]For example, Irma Cook and Jacob Peterson worked for Health Partners as HHAs, and Motorists paid Health Partners for their work at a rate of $25.75 per hour.  (Pl.'s Ex. 18.)  However, Motorists refused to pay more than $12 for Ms. Cook and Mr. Peterson's services when they worked for Luv-n-Care.

[191](Schrand Aff. ¶¶ 4-7.)

legitimate business purpose, as opposed to helping Plaintiff defraud Motorists.

### vii.    Attendant-Care Services "Provided" by Christina Marvaso

Motorists contends it is not liable for expenses related to Christina Marvaso.  Ms. Marvaso claims she worked as a regular caregiver for Mr. Whited, that she occasionally took him on outings, and that she provided accounting and management assistance for Luv-n-Care.

The Court holds that, as a matter of law, Motorists is not liable for any caregiving service allegedly provided by Ms. Marvaso.  No reasonable jury would believe the authenticity of the timesheets and typed DPNs Plaintiff submitted to Motorists.  Ms. Marvaso could not articulate a reason for why her mother had to write the hours on her timesheets, let alone a plausible explanation.  Even less believable is the evolution of Ms. Marvaso's DPNs.  Debbie Thompson, Motorists' paralegal, testified that she attended a meeting on March 26, 2009, between Ms. Lord, Ms. Marvaso and her attorney, Mr. Robinson.  At that meeting, Ms. Marvaso said that she did not write regular DPNs like other caregivers, but used a checklist to mark what services she provided during her shift.  Despite the fact that this statement strikes directly at Ms. Marvaso's credibility, her brief does not refute Ms. Thompson's allegations.  One month later, Ms. Marvaso testified that she filled out regular DPN forms by hand, like all the other caregivers, except that hers were not added to the regular binder that caregivers used to keep track of Mr. Whited's condition.  Instead, she said gave them to Ms. Green, who typed them onto a computer and gave her a print-out to sign.  Ms. Green confirmed that she kept Ms. Marvaso's DPNs separate from the other caregivers, and explained that

she shredded the originals after transcribing them, because they were written on notepads, not on the standard DPN forms used by all other caregivers. No reasonable jury would believe testimony so riddled with inconsistencies. However, if the jury had any remaining misgiving as to whether Ms. Marvaso actually helped take care of her uncle, these doubts would be dispelled by the fact that no handwritten DPN by any caregiver ever mentions her presence.

Aside from regular caregiving activities, Ms. Marvaso claims she sometimes took Mr. Whited on outings. Brenda Biddle and Frank Peterson confirmed this in their affidavits,[192] providing the only independent evidence that Ms. Marvaso spent any amount of time with Mr. Whited. Even if it is true, it is preposterous to argue that this was a remunerable service. Presumably, since Ms. Marvaso did not work an actual shift, there would have been two caregivers present when she arrived, but there is no evidence that one of them "clocked out" during the walk, and "clocked in" again at the end. Unless Ms. Marvaso could show these outings were part of an actual caregiving shift, no reasonable jury would require Motorists to pay for occasional walks she took with her uncle.

The only real work Ms. Marvaso appears to have done for Luv-n-Care was to help with accounting and other management-related tasks. These services may be compensable as part of Luv-n-Care's overhead; however, as discussed above, the Court does not have sufficient information to resolve this question.

The Court holds that, as a matter of law, Plaintiff falsely represented to Motorists that Christina Marvaso provided attendant-care services to Gary Whited between June

---

[192](*See* Biddle Aff. III, at ¶ 8; F. Peterson Aff. ¶ 21.)

2003 and the date of his death, when in fact she did not. Since these expenses were not actually incurred, they are not allowable under M.C.L. § 500.3107(1)(a). However, the Court defers a ruling on whether clerical assistance allegedly provided by Ms. Marvaso was reimbursable, and notes that this may be a question for the factfinder to decide.

### c.   Hours of Attendant Care Reasonably Necessary to Mr. Whited on a Daily Basis

The parties concur that, at a minimum, Mr. Whited required one full-time attendant caregiver, plus someone to provide assistance at certain times, or with certain procedures. However, they cannot agree on precisely how much additional care was needed. Plaintiff argues that two full-time caregivers, or 48 caregiving hours per day, were indispensable to properly care for Mr. Whited, because many procedures which require two persons cannot always be accurately scheduled. Motorists disagrees, and contends 28 hours would have sufficed.[193]

It is clear that, regardless of how much attendant care he deserved, Mr. Whited did not have two caregivers present with him at all times. However, to determine the adequate level of care under M.C.L. § 500.3107(1)(a), the Court would need more specific evidence than what is provided. For instance, it is undisputed that Mr. Whited's condition deteriorated progressively between June 2003 and his death in April 2010, so it stands to reason that his attendant-care needs would have increased during this period. Motorists may be right in claiming that Mr. Whited needed only 28 hours of attendant care each day; however, there is simply not enough evidence to make this

_____

[193]28 hours per day is the equivalent of one full-time caregiver and another person who provides up to four hours of assistance each day.

determination. Therefore, the Court reserves a ruling on this issue, while noting that it may ultimately be left to the factfinder to decide.

### C. Motion for Summary Judgment Against Christina Marvaso

Motorists claims that, between June 2003 and November 2008, it paid $52,534.97 for caregiving services allegedly provided by Ms. Marvaso. Motorists seeks to recover this entire amount, on grounds that Ms. Marvaso did not actually perform any of the services attributed to her.

Ms. Marvaso responds that she did not personally make any representation to Motorists concerning payments she received between 2003 and 2007. She argues that the only time she may have made such representations was when she handled billing for Luv-n-Care after Karla Schrand's departure and before Elizabeth Rehahn took over, from July to October 2008. However, she argues that there is no evidence she knew the services she provided were not reimbursable under the No-Fault Act. Ms. Marvaso also claims that she was not paid in 2007, and that, from June 2003 to April 2010, she received $30,433.71 in total compensation from Motorists.[194]

Motorists' action proceeds on theories of fraud/misrepresentation and unjust enrichment. The Court considers each separately.

### 1. Fraud/Misrepresentation

As noted above, the plaintiff in a fraud action must show that the defendant knowingly or recklessly made a false representation of material fact for the plaintiff to

---

[194](Deposition of Christina Marvaso, Marvaso Ex. D, at 120; Affidavit of Christina Marvaso, Marvaso Ex. C, at ¶ 7.)

rely on, and that the plaintiff acted in reliance and to its detriment. *City of Novi*, 473 Mich. at 254 n.8.

Motorists contends Ms. Marvaso fraudulently misrepresented that she provided attendant care to her uncle between June 2003 and November 2008. This time span is divisible into two periods, before and after the creation of Luv-n-Care.

### a. June 2003 – June 2007

Before Luv-n-Care was created, Ms. Green informed Motorists by telephone of the number of hours worked by each caregiver.[195] Motorists argues that Ms. Marvaso made a material representation about her services every time she endorsed a check from Motorists. This assertion is unsupported by law. Since there is no evidence that Ms. Marvaso spoke to Motorists or billed directly for her services between June 2003 to June 2007, the Court holds as a matter of law that she did not make any fraudulent representation during that period.

### b. Luv-n-Care Period (Oct. 2007 – Apr. 2010)

Motorists argues that Ms. Marvaso is personally liable for fraudulent acts by Luv-n-Care, in her capacity as a shareholder and officer of the company. As discussed above, in order to pierce the corporate veil and hold an individual officer liable, the plaintiff must show that "the corporate entity [was] a mere instrumentality of another entity or individual." *SCD Chemical Distributors*, 203 Mich. App. at 381.

The evidence does not support a finding that Luv-n-Care was Ms. Marvaso's instrumentality. To the contrary, the record indicates very clearly that she played a minor role in managing Luv-n-Care, compared to Patricia Green. There is no evidence

---

[195](Arezzo Dep. 312-13.)

that Ms. Marvaso hired caregivers, trained them, or gave them any order. Former caregivers testified that they did not work with Ms. Marvaso, and that the extent of her participation in running the company was to help her mother with office work.

For these reasons, the Court holds that equity does not support piercing Luv-n-Care's corporate veil to reach Ms. Marvaso personally.

### 2. Unjust Enrichment

Motorists contends that Ms. Marvaso was unjustly enriched at Motorists' expense because she received payment for attendant care services she did not provide to Mr. Whited. Ms. Marvaso responds that she was not unjustly enriched, because she was simply being paid for services she performed in connection with her uncle's care, and because there is no evidence that she knew these services were not reimbursable under the No-Fault-Act.

As the Court of Appeals of Michigan explains,

Our Supreme Court has long recognized the equitable right of restitution when a person has been unjustly enriched at the expense of another. Even though no contract may exist between two parties, under the equitable doctrine of unjust enrichment, a person who has been unjustly enriched at the expense of another is required to make restitution to the other.
. . .
The theory underlying quantum meruit recovery is that the law will imply a contract in order to prevent unjust enrichment when one party inequitably receives and retains a benefit from another.
. . .
The essential elements of a quasi contractual obligation, upon which recovery may be had, are the receipt of a benefit by a defendant from a plaintiff, which benefit it is inequitable that the defendant retain. Thus, in order to sustain a claim of quantum meruit or unjust enrichment, a plaintiff must establish (1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant. In other words, the law will imply

82

a contract to prevent unjust enrichment only if *the defendant has been unjustly or inequitably enriched at the plaintiff's expense.*
. . .

We agree with defendant that not all enrichment is necessarily unjust in nature.  In general,

> [a] third party is not unjustly enriched when it receives a benefit from a contract between two other parties, where the party benefited has not requested the benefit or misled the other parties . . . . Otherwise stated, the mere fact that a third person benefits from a contract between two other persons does not make such third person liable in quasi-contract, unjust enrichment, or restitution.  Moreover, where a third person benefits from a contract entered into between two other persons, in the absence of some misleading act by the third person, the mere failure of performance by one of the contracting parties does not give rise to a right of restitution against the third person. [66 Am Jur 2d, *Restitution and Implied Contracts*, § 32, p 628.]

Rather than examining solely whether a defendant was enriched, it is necessary to determine whether that enrichment was unjust or inequitable: "The key to any quantum meruit recovery from a noncontracting party is proof that he or she unjustly received and retained an independent benefit from the plaintiff's contractual services." *Id.*

*Morris Pumps v. Centerline Piping, Inc.*, 273 Mich. App. 187, 193-95 729 N.W.2d 898

(Ct. App. 2006) (other citations omitted) (emphasis added) (brackets in original).

Based on this summary of Michigan's law of unjust enrichment, the Court finds

that genuine issues of fact exist as to whether Ms. Marvaso was unjustly enriched, and,

if so, how much she profited at Motorists' expense.

## IV.    CONCLUSION

For reasons stated, Motorists' motion to dismiss is **GRANTED**; Plaintiff's action is

**DISMISSED WITH PREJUDICE**.

Motorists' motion for summary judgment is **GRANTED IN PART** and **DENIED IN**

**PART**.  Specifically, the Court holds that, as a matter of law, Motorists is entitled to full

reimbursement of all payments made for: (1) all periods when Mr. Whited was hospitalized in intensive care between June 2003 and April 2010; (2) all attendant-care services allegedly provided on the night shift by Patricia Green, from June 2003 to April 2010; (3) all attendant-care services credited to Christina Marvaso from June 2003 to April 2010, except for the period between July and November 2008, when Ms. Marvaso allegedly worked as an administrative assistant for Luv-n-Care; and (4) all hours credited to Brian O'Halloran.

Furthermore, the Court holds that, as a matter of law, Motorists is not required to pay for hours when: (1) caregivers performed household chores and housecleaning services; (2) the second caregiver was sent home before the end of the day shift; and (3) Mr. Whited disappeared on excursions where his caregivers could not, if necessary, provide assistance equivalent to what they could offer at home.  However, for each of these issues, the Court leaves for the factfinder to decide how many attendant-care hours Motorists is entitled to recover.

The Court finds that a genuine issue of material fact exists concerning whether a home health care agency like Luv-n-Care can demand higher rates in order to cover overhead costs.  Therefore, Motorists may not recover payments relating to services allegedly provided by Tim and Elizabeth Rehahn, and by Christina Marvaso between July and November 2008.  However, even if Luv-n-Care can charge higher rates to cover overhead, the factfinder will decide how many such hours Luv-n-Care was entitled to claim during its existence, and the remainder must be returned to Motorists.

Lastly, the Court **GRANTS** summary judgment to Christina Marvaso on Motorists' fraud claims; Motorists' fraud claims against Ms. Marvaso are **DISMISSED**.  However,

summary judgment is **DENIED** on Motorists' unjust enrichment claims against Ms.

Marvaso; these claims will proceed.

**IT IS ORDERED**.

s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  September 28, 2010

The undersigned certifies that a copy of this
document was served on the attorneys of record
by electronic means or U.S. Mail on September
28, 2010.

s/Linda Vertriest
Deputy Clerk